1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  SPECIALTY SURPLUS INSURANCE
    COMPANY,

11                          Plaintiff,                    CASE NO. C03-0927C

12       v.                                               ORDER

13  SECOND CHANCE, INC., et al., and BRENDA
    CROCKETT, et al.,

14

15                          Defendants.

16  I.       INTRODUCTION

17          This matter has come before the Court on the Crockett Counterclaimants' motion for summary

18  judgment on their insurance bad faith claims against Plaintiff Specialty Surplus (Dkt. No. 108).  Plaintiff

19  Specialty Surplus filed a motion for a Rule 56(f) continuance of the motion (Dkt. No. 111).  Having

20  considered the papers filed by the parties in support of and in opposition to the Crockett motion, the

21  Court has determined that no oral argument is necessary.  Furthermore, as the Court finds that the

22  Crockett Counterclaimants have not sustained their burden on their summary judgment motion, Plaintiff's

23  56(f) motion is largely moot, with exceptions as noted below.  The Court finds and rules as follows.

24

25

26  ORDER – 1

II.     BACKGROUND

Although the Court has recounted some of the facts in this case in previous orders, the Court has not yet had occasion to present a more fleshed-out factual account of the events leading to this lawsuit. Specialty Surplus brought this declaratory judgment action to resolve an insurance policy coverage dispute soon after agreeing to defend its insureds, Second Chance and John Moeller, under a reservation of rights.  In February 2003, Second Chance and John Moeller had been sued in the King County Superior Court for incidents in which Mr. Moeller, a urinalysis laboratory director for Second Chance, was alleged to have secretly videotaped individuals in the act of providing urine samples for testing.  This was the *Crockett* litigation.  Mr. Moeller had already been involved in an earlier, nearly identical case, the *Rhodes* litigation.  The *Rhodes* case ultimately reached an out-of-court settlement.

Specialty Surplus provided a defense under a reservation of rights to Mr. Moeller in both the *Crockett* and the *Rhodes* cases.  In *Rhodes*, Specialty Surplus's letter to Mr. Moeller explaining its reservation of rights cited the policy provision limiting its coverage for claims asserted against Mr. Moeller to acts within the scope of his employment with Second Chance.  (Beauregard Decl. Ex. Z ("*Rhodes* ROR Ltr.") at 3.)  This letter was dated March 5, 2003.  One month later, Specialty Surplus sent Mr. Moeller another letter, this time regarding the *Crockett* litigation.  (Beauregard Decl. Ex. C ("*Crockett* ROR Ltr.").)  This letter, dated April 4, 2003, stated that a defense would be provided to Mr. Moeller subject to a reservation of rights.  While the April 4 letter omitted to expressly identify the scope of employment coverage issue, it did state "Specialty Surplus does not intend to waive its right to later assert other available coverage defenses, the facts of which it does not have knowledge at the present." (*Crockett* ROR Ltr. 3.)

At the beginning of the *Crockett* case, Specialty Surplus assigned a single insurance adjuster to manage the defense of all claims regarding both Second Chance and Mr. Moeller.  It was not until January 5, 2005, less than three months before the state court case was due to go to trial, that Specialty Surplus assigned a separate adjuster for each defendant.  Mr. Jason Messler, who had handled the file

ORDER – 2

1  since July 12, 2004, continued to handle the Second Chance claims, while Ms. Christine Phelan assumed

2  responsibility for Mr. Moeller's file.  Both Mr. Messler and Ms. Phelan reported to Mr. Jerry Rallo.

3       A few months prior to the splitting of the defense files, in November 2004, the Crockett

4  Counterclaimants moved the state court for an order determining as a matter of law that Mr. Moeller had

5  been acting within the course and scope of his employment when conducting the activities giving rise to

6  the claims at issue.  Second Chance filed a cross-motion moving for an order determining that Mr.

7  Moeller had *not* been acting in the scope of his employment.  While the motions were pending, the

8  Crockett Counterclaimants sent a policy limits demand for $3 million directly to Mr. Messler, the single

9  claims adjuster then concurrently responsible for both Mr. Moeller and Second Chance.  (Beauregard

10  Decl. Ex. M ("Settlement Offer Ltr.").)  The letter, dated November 30, 2004, stated that the settlement

11  offer would remain open until 5:00 p.m. on December 6, 2004.

12       The Crockett Counterclaimants did not send a copy of the letter to counsel for Second Chance or

13  counsel for Mr. Messler.  On December 9, 2004, Robert Novasky, counsel for Second Chance in the

14  present case, wrote a letter to counsel for the Crockett Counterclaimants stating:

15      I was quite surprised to receive a copy of a letter you drafted directly to Second Chance's
   insurer setting forth your position on liability and your demand.  As you are well aware,
16  Second Chance is represented by me privately, is represented by James Murphy in defense
   of the Crockett litigation, and Specialty Surplus has its own counsel for purposes of
17  coverage and liability analysis.

18      Given that there are three separate attorneys representing both Second Chance and
   Specialty Surplus, it is highly irregular and improper for you to have direct ex parte
19  communication with Specialty Surplus.  It is even more egregious that you didn't bother
   to copy any of the attorneys representing Second Chance and its insurer with your letter.
20
       In the future, please recognize professional and ethical courtesies and rules and direct any
21  correspondence pertaining to Second Chance, in any of its capacities, and to Specialty
   Surplus, to their respective attorneys.
22
23  (Love Decl. Ex. 10.)

24       On December 15, 2004, counsel for the Crockett Counterclaimants sent a letter to Specialty

25  Surplus's coverage counsel explaining its November 30 letter as follows:

26  ORDER – 3

The letter was sent in the case of *Crockett v. Second Chance* . . . . The letter was
intentionally directed to the adjuster for Specialty Surplus who we understood to be
handling the coverage in the underlying case. It was not copied to you out of the standard
concern that Specialty Surplus has an obligation to separate its duty to its insured in
evaluating coverage from the position it takes in a declaratory judgment action attempting
to avoid coverage . . . . The letter was sent in the same manner it would have been sent if
there were no declaratory judgment action.

(Love Decl. Ex. 11.)

In the meantime, the hearing on the motions regarding Mr. Moeller's scope of employment was

re-noted for January 25, 2005. The trial court eventually denied all the summary judgment motions

regarding this issue.

In March, the *Crockett* litigation went through mediation. The claim file, now handled by Ms.

Phelan, contained the following notes:

3/04/05     Spoke to Jerry about this file and he advise that I should not pay anything
            out on this file but agrees that I could offer nuisance to try today and not
            get sactioned — he told me to hold off on the MLR to go with Jason's file.

3/04/05     Recd a call from Erin . . . — she advised that all 4 def ended up offering
            10K to each 40 plnt and left the 31 who are on the MSJ out there — plnt
            advised that they are looking for approx 120K each and that they are
            denying the offers — . . . . will question the MLR again and see if setting
            reserves at this point on this portion of the file — as I think we should put
            them up — will discuss with Jerry once I get the pre-trial report . . . .

3/04/05     This is a matter I have discussed with Jerry decided that since the plnt has
            requested 9.2 million dollars — we will not end up paying on this file since
            it was not settled at mediation — as the when this goes to trial if the perp is
            found to be out of his sco of employment then we will disclaim and if he is
            found to be with in then Jasons file will payunder the Second Chance file
            — will wait the pre-trial report and then up the reserve to 35K as per
            Jerry's request — we will only place under 1 plnt — as per discussio as a
            percausion at this point — we can not see paying on this file now — called
            Erin and advised of same — monies off the table as discussed

(Beauregard Decl. Ex. F ("Phelan Claim File Notes") at SSIC-M-010–012.)[1]

A few days later, Ms. Phelan noted

3/08/05     Returned another call to the DC — Erin leaving a detailed call re the 2 bills

---

[1]Typographical and grammatical irregularities in the claim file notes are original to the notes.

ORDER – 4

| | | |
|---|---|---|
| 1<br>2 | | — expert and the way that we are handling as far as monies are off the table from us and that if Moeller is found liab we will disclaim coverage if not then the insd policy comes into play . . . . |
| 3<br>4<br>5 | 3/09/05 | Recd a letter in response to my discussion with her re the ROR stating that if the Moeller is found to be guilty we will disclaim as per our ROR in the beginning — which is how we handle all of these files and Jerry told me to handle in this manner |
| 6<br>7 | 3/09/05 | Also I L/M for Erin Hammond . . . as she gives me the info for the bills . . . I never agreed to or discussed with her . . . — will wait a calback to discuss same with her and the tone as she is not coverage counsel on this file — she should have no opinion . . . . |
| 8<br>9<br>10<br>11<br>12<br>13<br>14<br>15 | 3/10/05 | Recd a call back from Erin Hammond today revamping her letter as this is the first time we have actually spoken since 3/3 — the date of the mediation — I asked her why she would have offered more than the other 3 parties?? Does not make sense — she said b/c that is what I gave her which is not as I gave her 750 each — teh other 3 def offered only 10K — the letter of 3/8 in response to my voice mail — stated that she believes that she would like to continue the settlement talks — told her no if they was a few mor hundred that is fine up to the 750 to avoid lit fee but nothing else — she went on to argue that I should give her the limits of 3 million — I told her that I will have to check but the limits look to be only 1 million — asked if she has the ROR and the polic and she said no — I will get her same — I think the limit Jason advised is only 1 million for both files not separately — as this is a pro liability mater and based on the wrongful act of Mr. Moeller putting in the camera not individual peoples tapes |

(Phelan Claim File Notes at SSIC-M-014–016.)  The letter referred to on March 9 is included in the

record.  (Beauregard Decl. Ex. L.)

On March 19, 2005, counsel for Mr. Moeller faxed a letter to Specialty Surplus reiterating the

demand already made in the March 8 letter that Specialty Surplus pay the policy limits to settle the claim.

March 19 was a Saturday.  (Beauregard Decl. Ex. N.)  The following day, Sunday, March 20, Mr.

Moeller reached an agreement with the Crockett Counterclaimants, in which he stipulated to entry of a

$4.9 million judgment against him.  As part of the agreement, the Crockett Counterclaimants covenanted

not to execute against Mr. Moeller's personal assets and received an assignment of Mr. Moeller's rights

against Specialty Surplus and the Washington Insurance Guaranty Association.

On the first day of trial in state court, March 21, the parties had the stipulated judgment against

ORDER – 5

1  Mr. Moeller signed and entered.   The Crockett Counterclaimants subsequently dismissed their claims

2  against Second Chance without any payment.

3      Ms. Phelan's file notes from March 21, 2005, contain the following:

4  3/21/05     Also called Erin Hammond . . . to see where my pre-trial report is and what
               happen with the 31 plnts on Friday?  Is trial going forward today??
5
6  3/21/05     Spoke to Jason and he told me that there were 30 dismissed and 1 was able
               to prove that he was there at the time — he will be offering 1K to each of
               the remaining 43 plnts — we will stick with our 500 each — as far as we
7              both have heard trial is still on

8                          . . . .

9  3/21/05     Recd a fax this morning from DC stating that she disagrees with my offer
               of 500 each clmt and basically stated that she would lik the policy that
10             Jason told me he already produced to her —

11             I have not heard from her — will wiat

12  (Phelan Claim File Notes SSIC-M-020–022.)   The "fax" referred to appears to be Ms. Hammond's four-

13  page March 19 letter summarizing the progression of her attempts to reach an agreement with Ms.

14  Phelan, and in particular, expressing surprise about Ms. Phelan's March 14 letter to her communicating

15  Specialty Surplus's belief that Mr. Moeller had no liability.

16      On March 22, Ms. Phelan received news of Mr. Moeller's settlement from Mr. Messler:

17  3/22/05     I have yet to hear from Erin on this file but I spoke to Jason as to what
               happen and he stated that his atty called him at 1:30 his time 4:30 our time
18             stating that he was on his way hom and the plnt let second chance out of
               the case as the atty — Erin Hammo on behalf of Mr. Moeller put in a
19             judgement for 4.9 million dollars — I have never heard anything about this
               last I heard she was going to offer the 700 per clmt — as per our initial
20             mediation figures of up to 750 now I hear from Jason different that they
               settl
21
   (Phelan Claim File Notes SSIC-M-022–023.)
22
   On March 23, 2005, Ms. Phelan participated in a conference call with Erin Hammond, Scott Clement,
23
   and Jerry Rallo:
24
25  3/23/05     . . . seems that this is the first they could get a hold of us since te
               judgement was entered into on Sunday night and confirmed Monday
26  ORDER – 6

morning —

We know they are picking a jury today for the 2 def still in the case . . . — so we will pay there bill up to Sunday when they had discussed same —

Judgement=4,6125 million — was demand by plnt and accepted no dicaring by DC at all = which is 102,500.00 per person for the 45 still in the matter and 10K=280K for all parties dismissed on that Friday — to avoid appeal —

Basically they said that since I withdrew on the recommendation of Jerry the 500 each 3/8 then in our discussions on 3/10 I discussed again with Erin and told her if I could get a few hundred more as per the az aat mediation then I would but I asked her if it would settle it and she said not she requested the 3 million dollar agg — as per the policy — told her if it would not settle then there was no sense trying will go to trial — at that point I never heard back from her

(Phelan Claim File Notes SSIC-M-027–029.)

Subsequent to the cascade of events in the state court *Crockett* litigation, Specialty Surplus filed an amended complaint in the action before the Court, adding these new developments and requesting a determination that its policy provides no coverage for the Crockett claims.  In response, the Crockett Counterclaimants added a counterclaim of insurance bad faith against Specialty Surplus.  It is with respect to this latter counterclaim that the Crockett Counterclaimants now present their motion for summary judgment.

III.    ANALYSIS

    A.    *Standard of review*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d

ORDER – 7

1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 248.  The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

Specialty Surplus moved for a Rule 56(f) continuance of this motion for summary judgment, arguing that discovery yet to be had was material and necessary for it to defend against the motion.

Fed. R. Civ. P. 56(f) provides, in relevant part, that

> [s]hould it appear from the affidavits of a party opposing [a summary judgment motion] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court . . . may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had.

The Ninth Circuit has further clarified how this rule should operate: "To prevail under this Rule, parties opposing a motion for summary judgment must make (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (2004) (citing *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986).  In addition, "[t]he burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence exists, and that it would preclude summary judgment." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).

Since the date when the motion for continuance was filed, the Court has denied Specialty Surplus's motions to compel production of Mr. Moeller's defense files and for more definite answers from the Crockett Counterclaimants.  Therefore, to the extent that Specialty Surplus hoped to rely on the results of these motions in its opposition to the motion for summary judgment, it may no longer do so.

ORDER – 8

1    However, Specialty Surplus has yet to take Mr. Moeller's deposition, now scheduled for March 8, 2006.

2          Because the Court finds that certain issues at stake in the present motion for summary judgment

3    may turn on testimony or other evidence elicited from Mr. Moeller at his deposition, Specialty Surplus's

4    motion for a continuance is GRANTED in part, as noted *infra*.  However, because the analysis of many

5    of the issues at stake in the motion for summary judgment relies only on Specialty Surplus's conduct, and

6    because Specialty Surplus has failed to sustain its burden of showing that evidence from Mr. Moeller's

7    deposition would preclude summary judgment, the motion for continuance is DENIED in part, as noted

8    *infra*.  Finally, even though the Court arrives at the overall conclusion that the motion for summary

9    judgment should be denied, in the process of reaching that conclusion, the Court makes some findings on

10   which Mr. Moeller's deposition has no bearing.

11         B.      *Bad faith analysis framework*

12         The insurance bad faith cause of action arises out of the idea that "the business of insurance

13   affects the public interest and that an insurer has a duty to act in good faith."  *Kirk v. Mt. Airy Ins. Co.*,

14   951 P.2d 1124, 1126 (Wash. 1998).  "In order to establish bad faith, an insured is required to show the

15   breach was unreasonable, frivolous, or unfounded."  *Id.*  "Bad faith will not be found where a denial of

16   coverage or a failure to provide a defense is based upon a reasonable interpretation of the insurance

17   policy."  *Id.*

18         In *Tank v. State Farm Fire & Casualty Co.*, the Washington Supreme Court ruled that insurance

19   companies defending actions under a reservation of rights are to be held to a higher standard of good

20   faith than mere fair dealing and equal consideration for the insured's interests.  715 P.2d 1133, 1137

21   (Wash. 1986).  Among the things an insurer must do to fulfill its enhanced obligation under *Tank* are to

22   fully inform the insured of "*all* developments relevant to his policy coverage and the progress of the

23   lawsuit," as well as "refrain from engaging in any action which would demonstrate a greater concern for

24   the insurer's monetary interest than for the insured's financial risk."  *Id.*

25         In addition, where an insurer provides a defense subject to a reservation of rights,

26   ORDER – 9

(1) harm is an essential element of an action for an insurer's bad faith handling of a claim . . .; (2) if the insured shows by a preponderance of the evidence the insurer acted in bad faith, there is a presumption of harm; (3) the insurer can rebut the presumption by showing by a preponderance of the evidence its acts did not harm or prejudice the insured; and (4) if the insured prevails on the bad faith claim, the insurer is estopped from denying coverage.

*Safeco v. Butler*, 823 P.2d 499, 505 (Wash. 1992).

Whether an insurer acted in bad faith and whether the insurer's acts prejudiced the insured are both questions of fact. *Id.* at 506. Here, as the moving parties, the Crockett Counterclaimants bear the burden of showing that there is no genuine issue of material fact either with regard to whether Specialty Surplus acted in bad faith or with regard to whether the alleged bad faith prejudiced Mr. Moeller. *Id.*

The alleged bad faith acts identified by the Crockett Counterclaimants fall into three main categories: (1) Specialty Surplus denied Mr. Moeller an early opportunity to settle when it failed to communicate the November 30, 2004 settlement offer (sent only to Mr. Messler) to Mr. Moeller or his counsel; (2) Specialty Surplus breached its duty to settle; and (3) even while conducting Mr. Moeller's defense, Specialty Surplus was engaged in impermissible attempts to extinguish Mr. Moeller's coverage. The Court will address each category in turn.

C.      *Denial of opportunity to settle*

The November 30, 2004 settlement offer was addressed and sent only to Jason Messler, the adjuster then handling Mr. Moeller's defense. (Settlement Offer Ltr. 1, SSIC-SC-2092.) It stated, in pertinent part:

Dear Mr. Messler,

This settlement demand for policy limits is being sent to you on behalf of the Plaintiffs in the [*Crockett*] lawsuit . . . .

This demand is being submitted to you as the insurer for Second Chance and its director to determine whether you are interested in resolving this claim prior to further litigation, to provide a mechanism for you to fully protect your insured and to avoid entry of a large judgment against Second Chance and John Moeller.

(*Id.*) However, two pages later, the letter states

ORDER – 10

1    Because, under Washington law, it is the plaintiffs' burden to offer to settle within policy
     limits, the plaintiffs are offering Second Chance and John Moeller an opportunity to settle
2    for policy limits in return for a covenant not to execute.  In making this settlement, we are
     offering to settle the claims brought by all plaintiffs in the pending case against Second
3    Chance and John Moeller.

4    (*Id.* 3, SSIC-SC-2094.)

5        *Tank* requires that an insurer defending under a reservation of rights, like Specialty Surplus,

6    inform the insured of the progress of his lawsuit.  715 P.2d 1137.  *Tank* goes on to explain that full

7    disclosure regarding "progress" includes disclosure of all settlement offers made by the insurer.  *Id.*

8    Specialty Surplus interprets this language to mean that under *Tank*, an insurer need disclose *only*

9    settlement offers made by the insurer.  Although the Court cannot agree with this interpretation, the

10   Court's disagreement stems from a different source than the authority proposed by the Crockett

11   Counterclaimants.[2]

12       First, *Tank* states, "[i]nformation regarding progress of the lawsuit includes disclosure of all

13   settlement offers made by the company."  *Id*.  This sentence contains no exclusions and leaves the

14   category of "information regarding progress of the lawsuit" open.  Generally, it should be obvious that

15

16   _____

17       [2]The Crockett Counterclaimants quote indiscriminately from separate sections of *Tank* dealing
     with an insurer's obligation to an insured and the duties of defense counsel retained by the insurer to
18   defend insureds under a reservation of rights.  With respect to the latter, *Tank* elaborates further on the
     importance of full disclosure of settlement opportunities:

19       [A]ll offers of settlement must be disclosed to the insured as those offers are presented.  In
         a reservation-of-rights defense, it is the insured who may pay any judgment or settlement.
20       Therefore, it is the insured who must make the ultimate choice regarding settlement.  In
         order to make an informed decision in this regard, the insured must be fully apprised of all
21       activity involving settlement, whether the settlement offers or rejections come from the
         injured party or the insurance company.
22

23   *Id.* at 1138.  However, this discussion of the reasons why the insured must be informed of settlement
     offers is underpinned by the *Tank* Court's concern regarding an *attorney's* duty to his or her client and
24   the Rules of Professional Conduct governing attorney conduct *in addition* to the peculiar situation of an
     insured in a reservation-of-rights defense.  Thus, if an insurer is similarly obligated to inform an insured of
25   settlement offers, that apparently similar obligation stems from a different source.

26   ORDER – 11

1    information regarding any opportunity to settle would constitute information regarding progress of the

2    lawsuit, irrespective of the source of the settlement offer.  Thus, *Tank* does not stand for the proposition

3    that *only* settlement offers from the insurer need to be disclosed to the insured.[3]

4           Second, *Tank* requires the insurer to "refrain from engaging in any action which would

5    demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk."

6    *Id*.  In other words, in order to find an insurer not liable for a *Tank* violation, a court would have to find

7    that any knowing non-disclosure of information to an insured did not demonstrate greater concern for the

8    insurer's monetary interest than for the insured's.  This is a tall order — there would seem to be few

9    factual scenarios in which an insurer's withholding of information from an insured could be shown not to

10   be relatively self-serving vis à vis the insured's interests.  Thus, even if an insurer's obligation to keep its

11   insured informed does not absolutely mandate disclosure of a settlement offer made by an opposing party,

12   the Court concludes that *Tank*'s prohibition on actions favoring an insurer's interests over an insured's, in

13   most cases, results in disfavor of an insurer's failure to communicate settlement offers to an insured.

14          It also bears noting that Specialty Surplus concedes that under *Tank*, 715 P.2d at 1137, it was Mr.

15   Moeller, as the insured in a reservation-of-rights defense, who ultimately had to decide whether to settle.

16   (Pl.'s Opp'n 22.)  In light of this recognition, it is difficult to comprehend how Specialty Surplus's failure

17   to communicate the November 30 offer might not violate *Tank* by demonstrating a greater concern for its

18   own monetary interest than for Mr. Moeller's.

19          In the case at bar, Specialty Surplus argues that the settlement demand

20          (1) was directed to Specialty Surplus only, (2) was for an amount ($3 million) that the
            claimants had reason to know only an insurer, not Moeller, could pay, (3) contained a
21          calculatedly short time (six calendar days) for response, and (4) was presented at a time

22   _____

23          [3]Specialty Surplus's reliance on *Truck Insurance Exchange of Farmers Insurance Group v.
     Century Indemnity Co.*, 887 P.2d 455, 460 (Wash. Ct. App. 1995), is misplaced.  This case imposes a
24   positive obligation on an insurer to communicate to an insured every settlement offer that exceeds policy
     limits.  *Id*. at 460.  However, like *Tank*, although *Truck Insurance Exchange* expressly imposes a single
25   positive obligation, it does not limit the insurer's obligations to that single obligation.

26   ORDER – 12

when the *Crockett* claimants knew substantial unresolved coverage issues existed, and (5) was designed to "set up" Specialty Surplus for excess liability.

(Pl.'s Opp'n 12.)  Of these reasons, only the first two are relevant to Specialty Surplus's duty to communicate the offer.  Although Specialty Surplus is correct insofar as the fact that the letter was addressed and sent only to Mr. Messler, the claims adjuster, the content of the letter at least suggests that the offer was also intended for Second Chance and Mr. Moeller.  In particular, the Court notes that the letter states, "the plaintiffs are offering Second Chance and John Moeller an opportunity to settle for policy limits" (Settlement Offer Ltr. 3, SSIC-SC-2094), in a context that makes it clear that though the *letter* is addressed to Specialty Surplus, it contemplated an *offer* to Second Chance and Mr. Moeller.  At the very least, this language renders the identity of the offerees targeted by the letter ambiguous.  The question whether, under these circumstances, including the large amount demanded, Specialty Surplus's decision not to pass on news of the letter and its contents to Second Chance and Mr. Moeller (or their legal representatives) was reasonable or demonstrated a greater concern for the insurer's monetary interest than for the insured's financial risk, is a question of fact requiring further development of the record.

The remaining reasons proffered by Specialty Surplus are either irrelevant as to whether the insurer had a *Tank* duty to communicate the settlement offer or have no effect as a legal excuse to the duty.  The November 30 letter contained express language indicating that more time was available, by request, if necessary.  (Settlement Offer Ltr. 4, SSIC-SC-2095.)  The alleged existence of "substantial unresolved coverage issues" does not affect whether the settlement offer should be communicated to the insured, but it could certainly affect the insurer's decision on the accompanying issues to discuss with the insured (*e.g.*, reminding the insured of potential coverage issues and how they could affect an uncovered settlement).  Similarly, regardless of whether the offer was designed to "set up" Specialty Surplus for excess liability, the offer was still a legally effective offer and could be accepted and enforced.  Specialty Surplus's decision not to communicate the offer is still held to a *Tank* standard of conduct.  If Specialty

ORDER – 13

1  Surplus had reason to believe that the offer was not made in good faith or that it was defective in some

2  other way, these reasons are pertinent to the question of whether its actions in failing to communicate the

3  offer impermissibly demonstrated greater concern for its own monetary interest than for Mr. Moeller's.

4       Because the Court finds that there are genuine issues of material fact as to why and how certain of

5  Specialty Surplus's proffered reasons led it to decline to communicate the settlement offer to Mr.

6  Moeller, summary judgment on whether this failure constituted bad faith is not appropriate at this time.

7       Specialty Surplus argues that even if the failure to communicate the November 30 settlement offer

8  constitutes bad faith as a matter of law, this failure did not prejudice Mr. Moeller. *See Safeco v. Butler*,

9  829 P.2d at 505 (establishing that harm is an essential element of an action for insurance bad faith).  If the

10  insured shows by a preponderance of the evidence that the insurer acted in bad faith, harm is presumed.

11  *Id.*  The insurer may then rebut the presumption of harm by showing by a preponderance of the evidence

12  that no harm or prejudice resulted from the bad faith acts.  *Id.*

13       Here, Specialty Surplus argues that even if its failure to communicate the November 30 settlement

14  offer constituted a bad faith act, Mr. Moeller suffered no harm or prejudice from the offer because: (1)

15  Mr. Moeller's counsel received notice of the settlement offer on or around December 15; (2) Mr. Moeller

16  was "unable to pay a three-million-dollar settlement or any other large amount out of his own pocket";

17  (3) further exposure to litigation does not constitute harm; and (4) even if Mr. Moeller had been informed

18  of the settlement offer, there is no evidentiary support for the assertion that he could have avoided further

19  litigation and incurred lesser or no judgment against him.  (Pl.'s Opp'n 13.)  As a preliminary matter, this

20  last argument is not well taken.  It is Specialty Surplus's burden to show, by a preponderance of the

21  evidence, that no harm resulted.  Specialty Surplus cannot evade or sustain its burden of proof by arguing

22  that the *insured* has not made a showing that he *did* suffer harm.  The harm is presumed.  *Safeco*, 829

23  P.2d at 505.  However, in light of the fact that Mr. Moeller has yet to be deposed by Specialty Surplus

24  and in light of the possibility that Specialty Surplus may elicit testimony tending to show that Mr. Moeller

25  suffered no prejudice, the Court finds that final determination of this particular issue is not appropriate at

26  ORDER – 14

1   this time.  Specialty Surplus's motion for continuance is granted as to this issue.

2          However, as the Court does not find that the additional evidence sought by Specialty Surplus is

3   germane to the remainder of its arguments on this issue, the Court finds it appropriate to make the

4   following findings.  With respect to Specialty Surplus's first argument, the record shows that Mr.

5   Moeller's counsel was copied on a letter written by Mr. Connelly (an attorney for the Crockett

6   Counterclaimants) to Mr. Love, dated December 15, 2004.  (Love Decl. 128–29.)  In this letter, Mr.

7   Connelly purports to explain to Mr. Love why the November 30 settlement offer was sent directly to

8   Specialty Surplus's adjuster, rather than to counsel for Specialty Surplus.  As the Crockett

9   Counterclaimants point out, Mr. Connelly refers only to the settlement offer insofar as it pertained to

10  *Second Chance*, since it appears that *Second Chance's* attorneys had objected to the fact that the letter

11  had been sent only to Mr. Messler.  Thus, the December 15 letter does not support Specialty Surplus's

12  assertion that *Mr. Moeller* (or his counsel) had been made aware of the settlement offer despite Specialty

13  Surplus's own alleged failure to communicate the offer to him.  In addition, Specialty Surplus fails to

14  explain, as is its burden, how this letter, dated nine days after the settlement offer had expired, could have

15  enabled Mr. Moeller or his counsel to settle the claims against him.

16         Specialty Surplus's second argument relies on Mr. Moeller's relative "poverty" (Pl.'s Opp'n 13)

17  to assert that the ultimate $4.9 million settlement did not represent a greater hardship on Mr. Moeller

18  than the $3 million he might have settled for under the terms of the November 30 letter.  Specialty

19  Surplus argues that in either case, Mr. Moeller is unable to pay.  However, the Court finds persuasive the

20  Crockett Counterclaimants argument that Mr. Moeller's solvency is irrelevant.  The fact of the matter is

21  that Mr. Moeller was deprived of an opportunity to settle for $3 million, and instead, on his own, was

22  able to negotiate only a $4.9 million settlement, an amount that is more than 160% of what he could have

23  settled for.

24         Specialty Surplus argues that exposure to further litigation does not constitute harm.  However, a

25  Washington appeals court has found that where an insured " was deprived of the opportunity to have the

26  ORDER – 15

claim settled promptly within his policy limits, was needlessly exposed to litigation, and was forced to submit to a substantial judgment," harm should be presumed. *Besel v. Viking Ins. Co. of Wisc.*, 21 P.3d 293, 301 (Wash. Ct. App. 2001). Specialty Surplus attempts to differentiate *Besel* on the grounds that in that case, insurance coverage was uncontested and the insurer's liability was clear, absolute, and indefensible. (Pl.'s Opp'n 13.) However, these factors were considered in the appeals court's consideration of whether the insurer had a non-frivolous reason for acting in the manner it had. 21 P.3d at 300 (concluding that the insurer acted in bad faith as a matter of law). Once a court has proceeded to the question of whether the element of harm is present, as required by *Safeco*, the insurer's proffered reasons for its actions are no longer relevant. Therefore, the Court finds that Specialty Surplus's attempts to distinguish *Besel* have no merit. Under *Besel*, that Mr. Moeller was subjected to further litigation supports the presumption that he suffered harm as a result of Specialty Surplus's alleged failure to settle and failure to communicate the settlement offer to him.

For all the foregoing reasons, the Court finds that Specialty Surplus's first three arguments are insufficient as a matter of law to rebut the presumption that Mr. Moeller suffered prejudice or harm from its failure to communicate the November 30, 2004 settlement offer. However, because the interests of justice require that Specialty Surplus be allowed the opportunity to introduce evidence from the imminent deposition of Mr. Moeller on this subject, Specialty Surplus's motion for a Rule 56(f) continuance is granted as to this subject.

D.      *Failure to settle the claims against Mr. Moeller*

Generally speaking, Washington courts "have determined that an insurer's general obligation of good faith and fair dealing requires it, in an appropriate case, to settle even though the express terms of the policy do not impose that duty." THOMAS V. HARRIS, WASHINGTON INSURANCE LAW 18-2 (citing *Tyler v. Grange Ins. Ass'n*, 473 P.2d 193, 200 n.6 (Wash. App. Ct. 1970)). *See also Hamilton v. State Farm Ins. Co.*, 523 P.2d 193, 196–97 (Wash. 1974). This duty includes "an obligation at least to conduct good faith settlement negotiations sufficient to ascertain the most favorable terms available and

ORDER – 16

make an informed evaluation of the settlement demand." *Truck Ins. Exchange*, 887 P.2d at 460 (citing *Continental Cas. Co. v. United States Fid. & Guar. Co.*, 516 F. Supp. 384, 389 (N.D. Cal. 1981)). However, these Washington cases do not involve an insurer providing a defense under a reservation of rights, as in the present case — the question in the present case is how an insurer's obligation to settle a case is altered by the existence of a dispute over coverage. Washington courts have not addressed this specific issue. ID. at 19-6.

Specialty Surplus argues that because *Tank* establishes that the insured in a reservation-of-rights defense has the ultimate power to make a decision on whether to settle, 715 P.2d at 1137, the insurer has no duty to settle in a reservation-of-rights defense. However, this is a misinterpretation of *Tank*. Rather, the plain language of *Tank* merely removes control over the settlement from the insurer. In other words, although insurers still have a duty to settle, insureds in a reservation setting, as parties possibly facing personal financial exposure, have the right to make "the ultimate choice regarding settlement." *Id.*

An insurer's duty to settle, as imposed by the courts, springs from its general duty of good faith and fair dealing.[4] *Tyler*, 473 P.2d at 200 n.6. As discussed above, *Tank* altered the duty of good faith applicable to the reservation of rights context. *Tank*, 715 P.2d at 1137. Although insurers generally are allowed to give equal consideration to their own interests, *Tank* subjects insurers defending subject to a reservation of rights to a higher standard forbidding the insurer to take actions demonstrating a greater

---

[4] Specialty Surplus argues that an insurer has no duty to pay (also called the duty to indemnify) where there is no coverage, and attempts to recast that argument into the claim that there is no duty to settle where there is no coverage. However, the cases Specialty Surplus cites to for support, *see, e.g.*, *Hayden v. Mut. of Enumclaw Ins. Co.*, 1 P.3d 1167 (Wash. 2000), do not address an insurer's duty to settle. An insurer's duty to pay or indemnify are distinct from its duties to settle. While an insurer's duty to pay is contractually defined, *see Hayden*, 1 P.3d at 1171, an insurer's duty to settle arises from its duty of good faith and fair dealing towards its insured, *see Tyler*, 473 P.2d at 200 n.6. An insurer breaches its duty of good faith and fair dealing, "whether the carrier pays the claim or not, when its conduct damages the very protection and security which the insured sought to gain by buying insurance." *Coventry Assocs. v. Am. St. Ins. Co.*, 961 P.2d 933, 937 (Wash. 1998). Thus, the line of cases relied on by Specialty Surplus do not establish an insurer's right to connect its settlement decisions to issues of coverage. It also bears noting that a duty to settle is not the same thing as a duty to *pay* the settlement.

ORDER – 17

1   concern for its own monetary interests, as compared to the insured's.  *Id.*  As *Tank* speaks generally of an

2   insurer's duty of good faith, it follows that *Tank*'s modification of an insurer's duty of good faith in

3   general also applies specifically to an insurer's duty to settle.  Thus, *Tank* requires that an insurer in a

4   reservation of rights case conduct its approach to settlement in a way that does not demonstrate greater

5   concern for its own monetary interests than for its insured's.  As HARRIS points out, *Tank* permits an

6   insurer at least to consider *whether* it owes a settlement payment when it considers the *amount* of such a

7   payment.  HARRIS at 19-6.

8   HARRIS suggests that "[i]n resolving a case in which an insurer mixes coverage considerations

9   with its evaluation of the tort claim, the trier of fact in a subsequent bad-faith action must consider the

10   reasonableness of both the insurer's coverage and tort assessments."  ID. at 19-7.  The treatise also

11   suggests that one element of this analysis is "[w]hether the insurer made efforts to settle the liability claim

12   that were consistent with the strength of its coverage position."  ID.  While it seems reasonable to assess

13   this element, ultimately, the insurer's behavior is measured against the standard established by *Tank*.

14   Here, it appears from the record that Specialty Surplus was not willing to settle for more than

15   $750 per *Crockett* plaintiff.  (*See* Phelan Claim File Notes at SSIC-M-016 (naming figure of $750), 020

16   ("we will stick with our 500 each").)  The claim file notes are somewhat cryptic as to why Specialty

17   Surplus was holding the figure so low.  There are references in the notes to "I should not pay anything

18   out on this file" (*id*. 010), and  "we can not see paying on this file now" (*id*. 012), but there are also notes

19   which could mean that any payment would come out of the Second Chance file.  The record also contains

20   a March 8 letter from Mr. Moeller's counsel, in which Specialty Surplus is put on notice that "there is a

21   very real potential for a very large (potentially multi-million dollar) jury verdict in this matter" and "there

22   is real risk to Mr. Moeller's personal assets."  (Beauregard Decl. Ex. L.)

23   The Court is hesitant to make any conclusive findings with respect to Specialty Surplus's intent

24   regarding settlement of the case without further information as to the meaning of the claim file notes or as

25   to the discussions being had by the Specialty Surplus adjusters.  However, that Mr. Moeller's counsel

26   ORDER – 18

1   was so clearly of the opinion that Mr. Moeller was in imminent jeopardy tips the balance against Specialty

2   Surplus — in order to satisfy *Tank*, whatever course of action Specialty Surplus had mapped out or

3   planned to map out, that course of action must have considered the risk to Mr. Moeller's interests as they

4   were explained to Specialty Surplus by Mr. Moeller's counsel, and must not have demonstrated greater

5   concern for Specialty Surplus's own monetary interest than for Mr. Moeller's.

6          As there are genuine issues of material fact remaining to be resolved, summary judgment may not

7   be granted on the question of whether Specialty Surplus breached its duty to settle Mr. Moeller's case.

8          E.      *Specialty Surplus's alleged attempts to extinguish Mr. Moeller's coverage*

9          The Crockett Counterclaimants argue in their motion that the following actions taken by Specialty

10  Surplus constitute bad faith as a matter of law:

11         (1) improperly utilizing information collected in the commingled claim files against Mr.
       Moeller's best interests; (2) surprising Mr. Moeller with the scope of employment
12     coverage defense though it was never asserted in the reservation of rights letter; (3) hiring
       a psychiatrist to testify against Mr. Moeller about the scope of employment issue; (4)
13     subjecting Mr. Moeller to a humiliating psychiatric examination; (5) refusing to engage in
       meaningful negotiations with the Crockett Counterclaimants during the weeks immediately
14     before trial; (6) continuing to commingle information as between Mr. Moeller and Second
       Chance's defenses even after the claim files were split based upon the well know conflict
15     of interest; (7) underrepresenting the amount of available insurance coverage in the
       reservation of rights letter; . . . (8) retroactively firing Mr. Moeller's lawyer for acting in
16     his best interests versus those of Specialty Surplus; [and (9)] never put[ting] Mr. Moeller
       on notice of the inherent conflict of interest with Second Chance.

17  (Mot. 14–15.)  After having had an opportunity to review Specialty Surplus's response, the Crockett

18  Counterclaimants withdrew their arguments as to (1), (3) and (4).

19

20

21

22

23

24

25

26  ORDER – 19

1                    *1.    Scope-of-employment coverage defense*

2          *Tank* requires that an insurer fully inform the insured of "*all* developments relevant to his policy

3    coverage." 715 P.2d at 1137.  In the present case, Specialty Surplus had occasion to send Mr. Moeller

4    two reservations of rights letters, one in the *Rhodes* case and one in the *Crockett* case.  The *Rhodes*

5    letter, dated March 5, 2003, expressly specified a scope-of-employment reservation of rights.  However,

6    in the *Crockett* letter, dated April 4, 2003, Specialty Surplus did not specifically name the scope-of-

7    employment coverage defense.  The *Crockett* letter did, however, state "Specialty Surplus does not

8    intend to waive its right to later assert other available coverage defenses, the facts of which it does not

9    have knowledge at the present."

10         Generally-worded reservations of rights are disapproved.  *Weber v. Biddle*, 483 P.2d 155, 159

11   (Wash. Ct. App. 1971) (citing with approval a Michigan court's finding that a general reservation of

12   rights was legally insufficient because it was vague and uncertain).  Such reservations of rights are faulted

13   for not stating the specific policy defenses upon which the insurer intends to rely.  *Id.*  Here, Specialty

14   Surplus does not deny that it failed to expressly specify the scope-of-employment defense in the context

15   of the *Crockett* litigation.  Instead, it argues that because it had specified this coverage defense in the

16   *Rhodes* litigation and because Mr. Moeller's counsel had briefed and litigated the issue in the *Rhodes*

17   action, Mr. Moeller was not "surprised" or unprepared to respond to the issue in the context of *Crockett*.

18   In addition, Specialty Surplus argues that its letter, reserving "all defenses," should have put Mr. Moeller

19   on notice of the availability of the scope-of-employment defense.

20         *Weber* squarely disposes of the latter argument.  Under *Weber*, Specialty Surplus's reservation of

21   "all defenses," without more, is legally insufficient as a reservation of the scope-of-employment defense.

22   *Weber* and *Tank* make clear that insurers are obliged to keep their insureds informed as to the policy

23   defenses upon which the insurer intends to rely.  *Weber*, 483 P.2d at 159; *Tank*, 715 P.2d at 1137.

24   Obviously, an insurer cannot be expected always to know the specific coverage defenses available to it at

25   the inception of an action or claim against its insured.  The insurer should not be faulted for this inability.

26   ORDER – 20

However, *Tank* obliges the insurer to inform the insured of developments relevant to his or her policy coverage. This clearly includes the obligation to inform the insured when it becomes clear that a specific coverage defense may be available, and particularly when the insurer determines that it will *pursue* that specific coverage defense.

Here, the record is ambiguous as to when Specialty Surplus determined that it would pursue the defense and as to when Mr. Moeller was notified of the defense. The March 19, 2005 letter sent by Mr. Moeller's counsel to Ms. Phelan suggests that the earliest date on which Mr. Moeller may have become aware of Specialty Surplus's intent to pursue the scope-of-employment coverage defense in the *Crockett* litigation was on March 8, 2005. (Beauregard Decl. Ex. N (reflecting awareness that "Specialty Surplus intended to wait for a determination at trial whether Mr. Moeller was within the course and scope of his employment").) Ms. Phelan's file notes reflect that Specialty Surplus adjusters had been discussing this possibility as early as March 4, 2005. Specialty Surplus's motion papers suggest that the scope-of-employment coverage defense had been contemplated all along in the *Crockett* action. Because the factual record on this point is sparse, the Court finds that there remains a genuine issue of material fact as to whether and when Mr. Moeller (or his counsel) was notified of the insurer's intent to pursue this specific defense. This factual issue is germane to the ultimate question of whether Specialty Surplus will be estopped from asserting the defense now. *See, e.g.*, *Safeco v. Butler*, 823 P.2d at 506 (finding questions of fact as to whether insurer's decision to defend under a reservation of rights over two months prior to giving notice to insureds of the ROR constituted bad faith and whether it prejudiced insureds).

Specialty Surplus's assertion that Mr. Moeller knew or should have known of its intent to assert the scope-of-employment coverage defense by virtue of the *Rhodes* litigation is relevant to the question of whether Mr. Moeller was prejudiced by Specialty Surplus's failure to expressly assert the defense in the *Crockett* action. However, Specialty Surplus fails to show that notice of its intent to assert the defense in *Rhodes* should also have served as notice of its intent to assert the defense in *Crockett*. At the very most, perhaps Specialty Surplus could establish that Mr. Moeller knew or should have known

ORDER – 21

that the defense was *available* in *Crockett*. However, Mr. Moeller cannot be expected to know, absent notice from the insurer, whether the insurer *intends* to assert the defense. For this reason, the Court finds that assertion of the coverage defense in *Rhodes* did not amount to notice that the same coverage defense would be asserted in *Crockett*.

In sum, the Court finds that there remain genuine issues of material fact necessary to the determination of if and when Specialty Surplus notified Mr. Moeller of its intent to assert the scope-of-employment coverage defense in the *Crockett* action, and whether its manner of notification, if any, constituted bad faith that caused harm or prejudice to Mr. Moeller. Therefore, summary judgment on this issue in favor of the Crockett Counterclaimants is not appropriate at this time.

>   2.   *Alleged refusal to engage in meaningful negotiations with Crockett Counterclaimants prior to trial*

This claim is virtually identical to the Crockett Counterclaimants' argument that Specialty Surplus breached its duty to settle the *Crockett* claims against Mr. Moeller. For the same reasons as stated above in the Court's discussion of the duty to settle issue, the Court finds that summary judgment on this issue in favor of the Crockett Counterclaimants is not appropriate at this time.

>   3.   *Commingling claims files of Second Chance and Mr. Moeller*

The Crockett Counterclaimants argue that Specialty Surplus's commingling of its insureds' claim files was a *Tank* violation on the grounds that any "potential conflict of interest between the insurer and insured must be fully disclosed and resolved in favor of the insured." (Reply 10 (citing *Tank*).) While the statement of law is correct, the Crockett Counterclaimants fail to show how this principle applies to the alleged bad faith action at issue — the commingling of files. First, there is no showing with respect to how the commingling of files of two defendant-insureds, even where there is a conflict of interest *between* the *defendant-insureds*, has any bearing on the existence of a conflict of interest between the *insurer* and the *insured*. Second, the Crockett Counterclaimants fail to make any other specific arguments tending to show that the commingling of the files demonstrated greater concern for Specialty Surplus's own

ORDER – 22

1   monetary interest than for Mr. Moeller's.  For these reasons, the Court declines to find that the Crockett

2   Counterclaimants have shown that Specialty Surplus's commingling of the files constituted bad faith.  The

3   motion for summary judgment is denied as to this issue.

4                    *4.        Underrepresentation of the amount of available insurance*

5         Specialty Surplus informed Mr. Moeller in the *Crockett* reservation of rights letter that its policy

6   had an aggregate limit of $2 million, rather than the $3 million actually provided under the policy.

7   Specialty Surplus concedes that its letter mis-stated the amount.  However, Specialty Surplus claims that

8   this mistake was corrected and that the error caused no harm because Specialty Surplus now denies *all*

9   coverage and because the parties in the *Crockett* case all knew the correct aggregate limit.

10        The Crockett Counterclaimants argue that the underrepresentation in this case should be subject

11  to the holding in *Anderson v. State Farm Mutual Insurance Co.* that an insurer's failure to disclose the

12  full extent of coverage constitutes bad faith as a matter of law.  2 P.3d 1029, 1034 (Wash. Ct. App.

13  2000).  It is apparent that the underrepresentation in the present case and the failure to disclose in

14  *Anderson* are qualitatively different.  The failure in *Anderson* caused that court to remark that the insurer

15  had taken an "impermissibly self-serving view of the available evidence" in determining that an entire

16  category of coverage need not be disclosed to its insured.  *Id.*  Here, it is the Crockett Counterclaimants'

17  burden to show, on summary judgment, that there is no genuine issue of material fact that the

18  underrepresentation in the *Crockett* ROR letter resulted from a similar violation of the insurer's duty of

19  good faith to its insured.  They have not done so.  There is no evidence that Specialty Surplus knowingly

20  or deliberately misstated the amount available under the policy.  Furthermore, the misstatement is of a

21  nature that could easily be attributed to a mere typographical error — inadvertently pressing "2" rather

22  than its neighbor, "3".  The same could not be said if the misstatement had reflected a policy limit of

23  "2.5" million, for example.  For these reasons, because the evidence must be viewed in the light most

24  favorable to the non-moving party, the Court finds that the Crockett Counterclaimants have failed to

25  sustain their burden on summary judgment as to this claim.  Therefore, summary judgment as to this claim

26  ORDER – 23

1    is denied.

2              5.      *Retroactive "firing" of Mr. Moeller's counsel*

3              In the first few days of April, after Mr. Moeller entered into his settlement agreements with the

4    Crockett Counterclaimants, Specialty Surplus attempted to fire Mr. Moeller's counsel retroactive to

5    March 20, 2005.  (Beauregard Decl. Ex. P, e-mail exchange between Ms. Hammond and Ms. Phelan.)

6    Specialty Surplus does not dispute that it attempted to do so, but claims that Ms. Phelan thought there

7    was no more to do and that it would have hired another attorney to attend the reasonableness hearing set

8    for April 8, 2005.

9              The factual record as to this event is very sparse, consisting only of Ms. Phelan's claim file notes

10   and a brief e-mail exchange between Mr. Moeller's counsel and Ms. Phelan.  Neither of these sources

11   cast much light on the issue of why Ms. Phelan (and Specialty Surplus) thought it was appropriate to fire

12   Mr. Moeller's counsel retroactive to the date of the settlement and have another attorney attend the

13   reasonableness hearing.  Although it would be very easy to draw inferences unfavorable to Specialty

14   Surplus from the suspicious circumstances — the decision to fire defense counsel and substitute new

15   counsel to attend a reasonableness hearing on a settlement agreement crafted by former defense counsel

16   against the wishes of the insurer — the Court may not engage in this type of speculation on a summary

17   judgment motion.

18             The existing factual record could be read to support Specialty Surplus's argument that it thought

19   there was no more to do.  (*See*, *e.g.*, Beauregard Decl. Ex. P., Ms. Hammond's e-mail to Ms. Phelan

20   (specifying that there was "very little to do in this case," possibly in response to an undocumented

21   assertion by Ms. Phelan that there was "nothing" to do).)  Because the Court must construe the evidence

22   in the light most favorable to Specialty Surplus, the Court finds that there are genuine issues of material

23   fact remaining with respect to the circumstances surrounding Specialty Surplus's attempt to fire Mr.

24   Moeller's counsel.  Summary judgment on this claim in favor of the Crockett Counterclaimants is not

25   appropriate at this time.

26   ORDER – 24

1              6.       *Failure to notify Mr. Moeller of his conflict of interest with Second Chance*

2           The Crockett Counterclaimants flatly assert that Specialty Surplus's failure to inform Mr. Moeller

3    of his conflict of interest with Second Chance constituted bad faith.  They provide no argument regarding

4    the source of Specialty Surplus's alleged duty to inform Mr. Moeller that his interests were adverse to

5    Second Chance.  Without more specific arguments, the Court declines to speculate as to what these

6    arguments might have been merely in order to address their merits.  It was the Crockett

7    Counterclaimants' burden, on a summary judgment motion, to show that they are entitled, as a matter of

8    law, to judgment in their favor.  Because they have failed to sustain this burden, the motion for summary

9    judgment is denied as to this issue.

10   IV.     CONCLUSION

11          The Crockett Counterclaimants' motion for summary judgment is DENIED.  Specialty Surplus's

12   motion for a Rule 56(f) continuance is GRANTED in part and DENIED in part.

13          SO ORDERED this 30th day of January, 2006.

14   

15   _____

16   UNITED STATES DISTRICT JUDGE

26   ORDER – 25