The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SPECIALTY SURPLUS INSURANCE COMPANY,
an Illinois corporation,

       Plaintiff,

    v.

SECOND CHANCE, INC., a Washington
corporation; JOHN MOELLER, a single person;
PIONEER HUMAN SERVICES; BRENDA
CROCKETT, et al.,

       Defendants.

CASE NO. C03-0927C

ORDER

SPECIALTY SURPLUS INSURANCE COMPANY,
an Illinois corporation,

       Plaintiff,

    v.

SECOND CHANCE, INC., a Washington
corporation; JOHN MOELLER, a single person;
PIONEER HUMAN SERVICES and JUSTINE
RHODES, a single person,

       Defendants.

ORDER - 1

I.    INTRODUCTION

This matter has come before the Court on the parties' cross-motions for summary judgment:

(1)    Crockett Counterclaimants' Motion re: Admitted Unethical Conduct (Dkt. No. 179);

(2)    Crockett Counterclaimants' Motion re: Scope of Employment (Dkt. No. 187);

(3)    Plaintiff Specialty Surplus's Motion re: Punitive Damages (Dkt. No. 217);

(4)    Plaintiff's Motion re: Coverage for Claims Against John Moeller (Dkt. No. 218);

(5)    Plaintiff's Motion re: Collusion and Fraud (Dkt. No. 219);

(6)    Plaintiff's Motion re: Bad Faith for (1) Purported Firing of Moeller's Counsel, (2) Conflict of Interest, (3) Aggregate Limit, (4) Scope of Employment and (5) Emotional Distress (Dkt. No. 220);

(7)    Plaintiff's Motion re: Duty to Settle (Dkt. No. 221);

(8)    Crockett Counterclaimants' Motion re: Deprivation of Settlement Opportunity (Dkt. No. 225);

(9)    Crockett Counterclaimants' Motion re: Duty to Settle (Dkt. No. 227);

(10)   Plaintiff's Motion re: Alleged *Tank* Violation (Dkt. No. 228);

(11)   Crockett Counterclaimants' Cross-Motion re: Firing, Conflict, Limits and NIED (Dkt. No. 231);

(12)   Crockett Counterclaimants' Cross-Motion re: Collusion and Fraud (Dkt. No. 233); and

(13)   Plaintiff's Motion re: Issues Raised in Supplemental Interrogatory Response (Dkt. No. 240).

Having carefully considered the papers filed by the parties in support of and in opposition to the motions, the Court has found that no oral argument shall be necessary.  The Court finds and rules as follows.

II.   BACKGROUND

The Court has already recounted many of the key facts of this case in its previous order denying the Crockett Counterclaimants' motion for summary judgment on insurance bad faith.  (*See* Dkt. No. 156.) Since that time, the parties appear to have developed their facts more fully through additional discovery.  In the interest of laying out a comprehensive factual background sufficient to support analysis of the parties' thirteen summary judgment motions, the Court will re-state the background of this case as set forth in its previous order (Dkt. No.156), supplemented by additional relevant material facts.

ORDER - 2

Specialty Surplus brought this declaratory judgment action to resolve an insurance policy coverage dispute soon after agreeing to defend its insureds, Second Chance and John Moeller, under a reservation of rights. In February 2003, Second Chance and John Moeller had been sued in the King County Superior Court for incidents in which Mr. Moeller, a urinalysis laboratory director for Second Chance, was alleged to have secretly videotaped individuals in the act of providing urine samples for testing. This was the *Crockett* litigation. Mr. Moeller had already been involved in two earlier, nearly identical cases, the *Rhodes* and *Bagby* litigations. Both cases were ultimately resolved in out-of court settlements — *Rhodes* for $112,500, and *Bagby* for $125,000.

Specialty Surplus provided a defense under a reservation of rights to Mr. Moeller in both the *Crockett* and the *Rhodes* cases. In *Rhodes*, Specialty Surplus's letter to Mr. Moeller explaining its reservation of rights cited the policy provision limiting its coverage for claims asserted against Mr. Moeller to acts within the scope of his employment with Second Chance. (*Rhodes* ROR Ltr. 3.) This letter was dated March 5, 2003. One month later, Specialty Surplus sent Mr. Moeller another letter, this time regarding the *Crockett* litigation. (*Crockett* ROR Ltr.) This letter, dated April 4, 2003, stated that a defense would be provided to Mr. Moeller subject to a reservation of rights. While the April 4 letter omitted to expressly identify the scope of employment coverage issue, it did state "Specialty Surplus does not intend to waive its right to later assert other available coverage defenses, the facts of which it does not have knowledge at the present." (*Crockett* ROR Ltr. 3.) It also noted, in the section summarizing the plaintiffs' allegations, that it had been alleged that Mr. Moeller had acted within the course and scope of his employment.

At the beginning of the *Crockett* case, Specialty Surplus assigned a single insurance adjuster to manage the defense of all claims regarding both Second Chance and Mr. Moeller. It was not until January 5, 2005, less than three months before the state court case was due to go to trial, that Specialty Surplus

ORDER - 3

assigned a separate adjuster for each defendant.  Mr. Jason Messler, who had handled the file since July 12, 2004, continued to handle the Second Chance claims, while Ms. Christine Phelan assumed responsibility for Mr. Moeller's file.  Both Mr. Messler and Ms. Phelan reported to Mr. Jerry Rallo.

A few months prior to the splitting of the defense files, in November 2004, the Crockett Counterclaimants moved the state court for an order determining as a matter of law that Mr. Moeller had been acting within the course and scope of his employment when conducting the activities giving rise to the claims at issue.  Second Chance filed a cross-motion moving for an order determining that Mr. Moeller had *not* been acting in the scope of his employment.  While the motions were pending, the Crockett Counterclaimants sent a policy limits demand for $3 million directly to Mr. Messler, the single claims adjuster then concurrently responsible for both Mr. Moeller and Second Chance.  (Policy Limits Settlement Offer Ltr.)  The letter, dated November 30, 2004, stated that the settlement offer would remain open until 5:00 p.m. on December 6, 2004.  The Crockett Counterclaimants did not send a copy of the letter to counsel for Second Chance or counsel for Mr. Moeller.

Mr. Messler sent a copy of the letter to Mr. Murphy, one of Second Chance's attorneys, but did not send a copy to Mr. Moeller's counsel.  (Messler Dep. 77:10–15.)  On December 9, 2004, Robert Novasky, counsel for Second Chance in the present case, wrote a letter to counsel for the Crockett Counterclaimants stating:

> I was quite surprised to receive a copy of a letter you drafted directly to Second Chance's insurer setting forth your position on liability and your demand.  As you are well aware, Second Chance is represented by me privately, is represented by James Murphy in defense of the Crockett litigation, and Specialty Surplus has its own counsel for purposes of coverage and liability analysis.

> Given that there are three separate attorneys representing both Second Chance and Specialty Surplus, it is highly irregular and improper for you to have direct ex parte communication with Specialty Surplus.  It is even more egregious that you didn't bother to copy any of the attorneys representing Second Chance and its insurer with your letter.

ORDER - 4

1
2

> In the future, please recognize professional and ethical courtesies and rules and direct any correspondence pertaining to Second Chance, in any of its capacities, and to Specialty Surplus, to their respective attorneys.

3 (Love Decl. at Dkt. No. 116, Ex. 10.)

4 On December 15, 2004, counsel for the Crockett Counterclaimants sent a letter to Specialty

5 Surplus's coverage counsel explaining its November 30 letter as follows:

6
7
8
9

> The letter was sent in the case of *Crockett v. Second Chance* . . . . The letter was intentionally directed to the adjuster for Specialty Surplus who we understood to be handling the coverage in the underlying case.  It was not copied to you out of the standard concern that Specialty Surplus has an obligation to separate its duty to its insured in evaluating coverage from the position it takes in a declaratory judgment action attempting to avoid coverage . . . . The letter was sent in the same manner it would have been sent if there were no declaratory judgment action.

10 (Love Decl. at Dkt. No. 116, Ex. 11.)

11 In the meantime, the hearing on the motions regarding Mr. Moeller's scope of employment was re-

12 noted for January 25, 2005.  The trial court eventually denied all the summary judgment motions regarding

13 this issue.

14 In February, counsel for Mr. Moeller, Ms. Erin Hammond, sent Ms. Phelan an e-mail on the status

15 of the case, including impending depositions and motions, and noting that due to the plaintiffs' counsel

16 being "difficult", the parties had "stalled at the mediator selection phase."  (SSIC-M-239.)  On February 11,

17 counsel for Mr. Moeller sent Ms. Phelan a letter summarizing four depositions that had recently been taken.

18 (SSIC-M-232–238.)  According to this letter, two of the three plaintiffs deposed would be poor witnesses

19 on their own behalf, and the computer forensic engineer would make a good witness.  In addition, the letter

20 noted that two of the plaintiffs who had been scheduled to be deposed failed to appear at their depositions.

21 On February 28, Ms. Hammond promised to send Ms. Phelan a "summary/comprehensive letter"

22 regarding the case.  (SSIC-M-192.)  A few days later, Ms. Phelan e-mailed her a pre-trial report form,

23
24

ORDER - 5

which included questions about her opinion about the monetary and settlement value of the case.  (SSIC-M-260–263.)

In March, the *Crockett* litigation went through mediation.  Mr. Moeller did not attend.  After the unsuccessful attempt to mediate, his counsel sent him a letter, with a copy to Ms. Phelan, explaining what had happened.  (SSIC-M-181–182.)  As recounted in the letter, the plaintiffs "wanted to end the mediation if [the defendants] weren't immediately willing to offer an amount 'in the seven figures'."  In addition, the letter stated, "We didn't offer any money to the 31 remaining plaintiffs . . . who rely upon the fabricated testimony of Carolyn Phillips that she saw a camera and discussed it with you in 1998."

The claim file contained the following notes:

| | |
|---|---|
| 3/04/05 | Spoke to Jerry about this file and he advise that I should not pay anything out on this file but agrees that I could offer nuisance to try today and not get sanctioned — he told me to hold off on the MLR to go with Jason's file. |
| 3/04/05 | Recd a call from Erin . . . — she advised that all 4 def ended up offering 10K to each 40 plnt and left the 31 who are on the MSJ out there — plnt advised that they are looking for approx 120K each and that they are denying the offers — . . . . will question the MLR again and see if setting reserves at this point on this portion of the file — as I think we should put them up — will discuss with Jerry once I get the pre-trial report . . . . |
| 3/04/05 | This is a matter I have discussed with Jerry decided that since the plnt has requested 9.2 million dollars — we will not end up paying on this file since it was not settled at mediation — as the when this goes to trial if the perp is found to be out of his sco of employment then we will disclaim and if he is found to be with in then Jasons file will payunder the Second Chance file — will wait the pre-trial report and then up the reserve to 35K as per Jerry's request — we will only place under 1 plnt — as per discussio as a percausion at this point — we can not see paying on this file now — called Erin and advised of same — monies off the table as discussed |

(Phelan Claim File Notes at SSIC-M-010–012.)[1]

_____

[1]Typographical and grammatical irregularities in the claim file notes are original to the notes.

ORDER - 6

A few days later, Ms. Phelan noted:

> 3/08/05    Returned another call to the DC — Erin leaving a detailed call re the 2 bills
> — expert and the way that we are handling as far as monies are off the table
> from us and that if Moeller is found liab we will disclaim coverage if not then
> the insd policy comes into play . . . .

(Phelan Claim File Notes at SSIC-M-014.)

Ms. Hammond responded to Ms. Phelan's voicemail advising her that "monies are off the table" in a letter stating that "in light of the fact that there is a very real potential for a very large (potentially multi-million dollar) jury verdict in this matter, I was surprised to hear in your voicemail that the carrier is unwilling to pay anything to settle this case." (SSIC-M-172.)  The letter further recommended that Specialty Surplus promptly offer to pay the $3 million policy limits.[1]  (*Id.*)

Ms. Phelan documented her response:

> 3/09/05    Recd a letter in response to my discussion with her re the ROR stating that if
> the Moeller is found to be guilty we will disclaim as per our ROR in the
> beginning — which is how we handle all of these files and Jerry told me to
> handle in this manner

> 3/09/05    Also I L/M for Erin Hammond . . . as she gives me the info for the bills . . . I
> never agreed to or discussed with her . . . — will wait a calback to discuss
> same with her and the tone as she is not coverage counsel on this file — she
> should have no opinion
>            . . . .

> 3/10/05    Recd a call back from Erin Hammond today revamping her letter as this is the
> first time we have actually spoken since 3/3 — the date of the mediation — I
> asked her why she would have offered more than the other 3 parties??  Does
> not make sense — she said b/c that is what I gave her which is not as I gave
> her 750 each — teh other 3 def offered only 10K — the letter of 3/8 in
> response to my voice mail — stated that she believes that she would like to
> continue the settlement talks — told her no if they was a few mor hundred
> that is fine up to the 750 to avoid lit fee but nothing else — she went on to
> argue that I should give her the limits of 3 million — I told her that I will
> have to check but the limits look to be only 1 million — asked if she has the
> ROR and the polic and she said no — I will get her same — I think the limit
> Jason advised is only 1 million for both files not separately — as this is a pro
> liability mater and based on the wrongful act of Mr. Moeller putting in the
> camera not individual peoples tapes

---

[1] The parties to this action disagree whether the applicable policy limit is $1 million or $3 million.

(Phelan Claim File Notes at SSIC-M-014–016.)

On March 14, Ms. Phelan sent Mr. Moeller's counsel a letter and enclosed copies of the reservation of rights letters for both *Rhodes* and *Crockett*. Her letter stated:

> We have also reviewed your letter of March 8, 2005 and believe that we have made a good faith offer on behalf of Mr. Moeller. With our authorization, you offered $500.00 to each of the 42 plaintiffs at the mediation. Again, these offer [*sic*] were in good faith as we believe that our client, Mr. Moeller has no liability and these offers were made in the attempts to settle prior to trial.

(SSIC-M-176.) Ms. Phelan also reiterated her request that Ms. Hammond complete and return the pre-trial report.

In the meantime, at some point between March 8 and March 19, counsel for the Crockett Plaintiffs contacted Ms. Hammond to inquire as to whether Mr. Moeller would be interested in offering a judgment covenant not to execute and an assignment. (Hammond Dep. 139–40.) Ms. Hammond stated at her deposition that "I know I called Jack back and told him absolutely we want to do this, basically let's get the deal done." (*Id.* at 142.) By Thursday, March 17, Ms. Hammond had drafted a proposed memorandum of settlement for review by counsel for the Crockett Plaintiffs. (2d Supplem. Adams Decl. at 11.) Ms. Hammond did not inform Ms. Phelan of these developments, stating that she was protecting Mr. Moeller, her client. (Hammond Dep. 145:23.)

However, at 6:00 p.m. on Saturday, March 19, no final agreement had yet been reached. Ms. Hammond expressed some frustration "given that we understood there to have been a deal in place on Wednesday evening only to have that go sideways." (2d Supplem. Adams Decl. at 9.) The e-mail exchanges between counsel make reference to the possibility of a bad faith claim. (*Id.* (*e.g.*, "It sounds like your insurer is in a bad faith situation"; "Have they been set up at all for bad faith at this point?").)

Finally, on Sunday afternoon, March 20, the day before trial was scheduled to start, counsel for the Crockett Plaintiffs was finally ready to finalize the agreement. (*Id.* at 8.) Ms. Hammond testified at her

deposition that until she and Mr. Clement went to Tacoma to finalize the settlement, there had been no

discussion of the amount of the settlement.  (Hammond Dep. 145–46.)  When numbers were introduced

into the discussion, Mr. Moeller's counsel accepted without further negotiation the plaintiffs' proposal of

$4,612,500 plus an assignment.  (*Id.* at 148:10–11.)  As part of the agreement, the Crockett Plaintiffs

covenanted not to execute against Mr. Moeller's personal assets and received an assignment of Mr.

Moeller's rights against Specialty Surplus and the Washington Insurance Guaranty Association.  In

addition to this amount, and in order to resolve the whole case, Mr. Moeller's counsel proposed an

aggregate settlement amount of $280,000 for the plaintiffs who had been dismissed and whose claims were

then on appeal.

　　　On March 20, 2005, counsel for Mr. Moeller faxed a letter dated March 19 to Specialty Surplus

reiterating the demand already made in the March 8 letter that Specialty Surplus pay the policy limits to

settle the claim.  This letter was faxed sometime in the afternoon on March 20, 2005.

　　　On the first day of trial in state court, March 21, the parties had the stipulated judgment against Mr.

Moeller signed and entered.   The Crockett Counterclaimants subsequently dismissed their claims against

Second Chance without any payment.

　　　Ms. Phelan's file notes from March 21, 2005, contain the following:

| 3/21/05 | Also called Erin Hammond . . . to see where my pre-trial report is and what happen with the 31 plnts on Friday?  Is trial going forward today?? |
|---|---|
| 3/21/05 | Spoke to Jason and he told me that there were 30 dismissed and 1 was able to prove that he was there at the time — he will be offering 1K to each of the remaining 43 plnts — we will stick with our 500 each — as far as we both have heard trial is still on |
| | . . . . |
| 3/21/05 | Recd a fax this morning from DC stating that she disagrees with my offer of 500 each clmt and basically stated that she would lik the policy that Jason told me he already produced to her — |
| | I have not heard from her — will wiat |

(Phelan Claim File Notes SSIC-M-020–022.)  The "fax" referred to appears to be Ms. Hammond's four-page March 19 letter summarizing the progression of her attempts to reach an agreement with Ms. Phelan, and in particular, expressing surprise about Ms. Phelan's March 14 letter to her communicating Specialty Surplus's belief that Mr. Moeller had no liability.

On March 22, Ms. Phelan received news of Mr. Moeller's settlement from Mr. Messler:

| 3/22/05 | I have yet to hear from Erin on this file but I spoke to Jason as to what happen and he stated that his atty called him at 1:30 his time 4:30 our time stating that he was on his way hom and the plnt let second chance out of the case as the atty — Erin Hammo on behalf of Mr. Moeller put in a judgement for 4.9 million dollars — I have never heard anything about this last I heard she was going to offer the 700 per clmt — as per our initial mediation figures of up to 750 now I hear from Jason different that they settl |

(Phelan Claim File Notes SSIC-M-022–023.)

On March 23, 2005, Ms. Phelan participated in a conference call with Erin Hammond, Scott Clement, and Jerry Rallo:

| 3/23/05 | . . . seems that this is the first they could get a hold of us since te judgement was entered into on Sunday night and confirmed Monday morning — |
| | We know they are picking a jury today for the 2 def still in the case . . . — so we will pay there bill up to Sunday when they had discussed same — |
| | Judgement=4,6125 million — was demand by plnt and accepted no dicaring by DC at all = which is 102,500.00 per person for the 45 still in the matter and 10K=280K for all parties dismissed on that Friday — to avoid appeal — |
| | Basically they said that since I withdrew on the recommendation of Jerry the 500 each 3/8 then in our discussions on 3/10 I discussed again with Erin and told her if I could get a few hundred more as per the az aat mediation then I would but I asked her if it would settle it and she said not she requested the 3 million dollar agg — as per the policy — told her if it would not settle then there was no sense trying will go to trial — at that point I never heard back from her |

(Phelan Claim File Notes SSIC-M-027–029.)

ORDER - 10

On April 1, Ms. Hammond e-mailed Ms. Phelan a copy of the motion for a determination of reasonableness of the settlement.  Upon receiving this e-mail the following Monday morning, April 4, Ms. Phelan tersely responded, "As per our prior discussion, as of Sunday March 20, 2005 we no longer need your services.  We will have another attorney go to this conference."  (SSIC-M-087.)  After some clarification from Ms. Hammond regarding her continuing duties to her client and her inability to withdraw without giving the court notice, Specialty Surplus permitted Ms. Hammond and her firm to continue representing Mr. Moeller until the judgment was finally entered in late June.

III.    ANALYSIS

A.    *Summary judgment standard*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party.  *Anderson*, 477 U.S. at 248.  The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

1    The Crockett Counterclaimants rely in several instances on deposition testimony given in response

2    to hypothetical questions, characterizing this testimony as "admissions" on key issues.  The Court does not

3    agree.  To the extent that deponents testify about concrete factual issues, their testimony will be considered

4    as evidence.  To the extent that deponents were asked to speculate as to legal conclusions and regarding

5    hypothetical situations, or on the basis of facts disputed by the parties, the Court does not accept this

6    testimony as admissible evidence.

7         B.    Did Specialty Surplus Act in Bad Faith?

8         The insurance bad faith cause of action arises out of the idea that "the business of insurance affects

9    the public interest and that an insurer has a duty to act in good faith."  *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d

10   1124, 1126 (Wash. 1998).  "In order to establish bad faith, an insured is required to show the breach was

11   unreasonable, frivolous, or unfounded."  *Id.*  "Bad faith will not be found where a denial of coverage or a

12   failure to provide a defense is based upon a reasonable interpretation of the insurance policy."  *Id.*

13        In *Tank v. State Farm Fire & Casualty Co.*, the Washington Supreme Court ruled that insurance

14   companies defending actions under a reservation of rights are to be held to a higher standard of good faith

15   than mere fair dealing and equal consideration for the insured's interests.  715 P.2d 1133, 1137 (Wash.

16   1986).  Among the things an insurer must do to fulfill its enhanced obligation under *Tank* are to fully

17   inform the insured of "*all* developments relevant to his policy coverage and the progress of the lawsuit," as

18   well as "refrain from engaging in any action which would demonstrate a greater concern for the insurer's

19   monetary interest than for the insured's financial risk."  *Id.*

20        In addition, where an insurer provides a defense subject to a reservation of rights,

21        (1) harm is an essential element of an action for an insurer's bad faith handling of a
22        claim . . .; (2) if the insured shows by a preponderance of the evidence the insurer acted in
         bad faith, there is a presumption of harm; (3) the insurer can rebut the presumption by
23        showing by a preponderance of the evidence its acts did not harm or prejudice the insured;
         and (4) if the insured prevails on the bad faith claim, the insurer is estopped from denying
24        coverage.

*Safeco v. Butler*, 823 P.2d 499, 505 (Wash. 1992).

Whether an insurer acted in bad faith and whether the insurer's acts prejudiced the insured are both questions of fact. *Id.* at 506.

> 1.    *Did Specialty Surplus Properly Reserve its Right to Assert the Scope of Employment Issue?*

One fundamental issue is whether Specialty Surplus properly reserved its right to assert the scope of employment coverage defense. This matter was previously addressed by the Court in its January 30, 2006 order denying the Crocketts' motion for summary judgment. At that time, the Court found that there was still a genuine issue of material fact as to whether and when Mr. Moeller (or his counsel) was notified of the insurer's intent to pursue this specific coverage defense. Although the Court was not able to reach an ultimate conclusion, it did set forth the applicable law.

In brief, the Court explained that *Tank* requires that an insurer fully inform the insured of "*all* developments relevant to his policy coverage." 715 P.2d at 1137. In addition, the Court noted that generally-worded reservations of rights are disapproved. *Weber v. Biddle*, 483 P.2d 155, 159 (Wash. Ct. App. 1971) (citing with approval a Michigan court's finding that a general reservation of rights was legally insufficient because it was vague and uncertain). Such reservations of rights are faulted for not stating the specific policy defenses upon which the insurer intends to rely. *Id.*

The Court rejected Specialty Surplus's argument that Mr. Moeller should have been aware of the possibility that it might assert the scope of employment coverage defense in the context of *Crockett* because (1) it had specified this coverage defense in the *Rhodes* litigation; (2) Mr. Moeller's counsel had briefed and litigated the issue in the *Rhodes* action; and (3) its *Crockett* reservation-of-rights letter reserving "all defenses," should have put Mr. Moeller on notice of the availability of the scope-of-employment defense. In particular, the Court noted that

ORDER - 13

> *Weber* squarely disposes of the third argument.  Under *Weber*, Specialty Surplus's reservation of "all defenses," without more, is legally insufficient as a reservation of the scope-of-employment defense.  *Weber* and *Tank* make clear that insurers are obliged to keep their insureds informed as to the policy defenses upon which the insurer intends to rely.  *Weber*, 483 P.2d at 159; *Tank*, 715 P.2d at 1137.  Obviously, an insurer cannot be expected always to know the specific coverage defenses available to it at the inception of an action or claim against its insured.  The insurer should not be faulted for this inability.  However, *Tank* obliges the insurer to inform the insured of developments relevant to his or her policy coverage.  This clearly includes the obligation to inform the insured when it becomes clear that a specific coverage defense may be available, and particularly when the insurer determines that it will *pursue* that specific coverage defense.

(Jan. 30, 2006 Order 20–21.)

The more-fully developed record now before the Court reflects that Specialty Surplus contemplated the availability and viability of the scope of employment coverage defense from day one.  (*See* Messler Dep. 38:12–19.)  Although Specialty Surplus points out that Mr. Messler indicated only that the insurer *contemplated* the defense during this early period, rather than actually deciding to *assert* it, Specialty Surplus's obligation to inform Mr. Moeller arose prior to its actual assertion of the defense.  This is consistent with the Court's prior holding quoted above: "This clearly includes the obligation to inform the insured when it becomes clear that a specific coverage defense may be available, and particularly when the insurer determines that it will *pursue* that specific coverage defense."[2]  The Court finds that there is no genuine issue of material fact that Specialty Surplus specifically contemplated the scope of employment coverage defense very early on in the *Crockett* litigation and that it intended to pursue it as a possible avenue through which to disclaim coverage.

The record also indicates that Specialty Surplus probably never intended to inform Mr. Moeller more fully that it intended to assert this specific coverage defense prior to the actual invocation of the

---

[2] An insurer's decision to pursue a particular coverage defense occurs prior to its actual assertion of the defense.  Specialty Surplus contends that because it is required to make a reasonable investigation before asserting the defense, its actions were not inconsistent with the law.  However, once Specialty Surplus determined that the scope of employment coverage defense was one it would "investigate", its *Tank* duty required it to inform Mr. Moeller of the same.

ORDER - 14

1    defense.  Mr. Messler testified that it was his belief that the general reservation-of-rights letter was

2    sufficient to put Mr. Moeller on notice.  (Messler Dep. 38:23–39:10.)

3        Specialty Surplus argues that its *Crockett* reservation-of-rights ("ROR") letter was *not* generally

4    worded because it "listed several specific policy provisions upon which the insurer intended to rely,

5    followed by a reservation of the right to state more coverage defenses later, based on new facts."  (Pl.'s

6    Opp'n re: Scope of Employment 2.)  While it may be true that the ROR letter asserted some specific

7    coverage defenses, the letter did not specifically refer to the scope of employment coverage defense.

8    Specialty Surplus's own argument concedes that the scope of employment defense, if it could be

9    considered to have been asserted, was asserted in the general language of "other available coverage

10   defenses, the facts of which it does not have knowledge at present."  (*Crockett* ROR Ltr. 3.)

11       Specialty Surplus also argues that the ROR letter's characterization of the Crockett Plaintiffs'

12   claims should have put Mr. Moeller on notice that the scope of employment could be a coverage issue.

13   (*Crockett* ROR Ltr. 1 (stating "It is further alleged that you did this within the course and scope of your

14   employment.").)  This argument is not persuasive.  The section pointed to by Specialty Surplus is nothing

15   more than a summary of the Crockett Plaintiffs' allegations and is clearly labeled as such.  In contrast,

16   Specialty Surplus's discussion of its reservation of rights is contained in a section clearly labeled "The

17   Specialty Surplus Policy."  (*Crockett* ROR Ltr. 2.)

18       The Court finds that there is no genuine issue of material fact regarding Specialty Surplus's failure

19   to notify Mr. Moeller in a timely and adequately specific manner of its interest in the scope of employment

20   coverage defense.  Accordingly, the Court finds that under *Tank*, the Crockett Counterclaimants have

21   established as a matter of law that Specialty Surplus acted in bad faith with respect to its assertion of the

22   scope of employment coverage defense in the *Crockett* litigation.  The Crockett Counterclaimants' Motion

23   re: Scope of Employment (Dkt. No. 187) is GRANTED as to this part.

24

ORDER - 15

This, however, is not the end of the analysis.  Under *Safeco v. Butler*, the Crockett Counterclaimants may not prevail on their bad faith claim regarding Specialty Surplus's inadequate notice regarding this defense unless they show that Mr. Moeller was harmed by it.  823 P.2d at 503 (holding that "harm is an essential element of an action for bad faith handling of an insurance claim").  Once bad faith has been established, it falls to the insurer to rebut the presumption that the insured was harmed.  *Id*. at 504.

Specialty Surplus argues that Mr. Moeller was not prejudiced by its inadequate notice of the scope of employment coverage defense because (1) Mr. Moeller did not rely on the *Crockett* ROR letter; (2) Mr. Moeller's counsel knew of the coverage implications of the scope-of-employment issues and defended him against those allegations throughout the course of the action; and (3) several other defenses supported Specialty Surplus's denial of coverage.

Specialty Surplus contends that "[s]ince there is no reasonable reliance, the Crockett Counterclaimants can also show no detriment to Moeller."  (Pl.'s Opp'n re: Scope of Employment 20.)  However, Specialty Surplus's reference to "reasonable reliance" impermissibly shifts the burden of proof regarding harm in a bad faith claim back to the insured/third-party assignee.  The equitable estoppel analysis (in which "reasonable reliance" plays a role) is entirely separate and distinct from the bad faith analysis.  In order to succeed in rebutting the presumption of harm, Specialty Surplus must show by a preponderance of the evidence that its failure to notify Mr. Moeller of the scope of employment did not harm or prejudice him.  *Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc.*, 134 P.3d 240, 246 (Wash. Ct. App. 2006).

It is true that the question of whether Mr. Moeller was acting in the course and scope of his employment has been a substantive issue since the beginning of the *Crockett* litigation.  Mr. Moeller successfully defended against a motion for summary judgment on this issue in the underlying *Crockett* litigation.  Mr. Clement's deposition testimony establishes that he was well aware of the scope of

employment issue and its coverage implications. (Clement Dep. 21:10–23.)  However, mere awareness that Mr. Moeller's scope of employment is a significant substantive matter in the underlying litigation is not the same as knowing whether the insurer intends to disclaim coverage based on an exclusion premised on the scope of employment.  Even Mr. Clement's acknowledgment that he knew his position on the matter had implications with respect to coverage is not the same as knowing whether the insurer intends to base a denial of coverage on that specific defense.  Indeed, it could be entirely possible that Mr. Moeller and his counsel interpreted Specialty Surplus's failure to specifically enumerate the scope of employment defense in the *Crockett* ROR to mean that Specialty Surplus did not intend to assert it at all.

Specific knowledge that Specialty Surplus was contemplating the scope of employment exclusion as an available coverage defense could easily have materially altered Mr. Moeller's settlement position much earlier in the course of the *Crockett* litigation.  For example, if Mr. Moeller and his counsel had been aware that Specialty Surplus was actively looking into using the defense, Ms. Hammond may not have sent her October 10, 2004 letter terminating settlement discussions with the *Crockett* Plaintiffs.

Specialty Surplus's contention that its failure was immaterial because it had other solid coverage defenses it intended to assert rather misses the point.  An insured (and his or her counsel) may proceed one way if faced with one coverage defense, but proceed a different way if faced with a different coverage defense.  Therefore, the Court finds that whether or not Specialty Surplus had other "good" coverage defenses is irrelevant.

For these reasons, the Court does not find that Specialty Surplus has shown by a preponderance of the evidence that Mr. Moeller was not prejudiced or harmed by its failure to inform him in a timely manner that it specifically intended to pursue the scope of employment defense.  However, the Court also finds that Specialty Surplus has done enough to show that genuine issues of material fact remain as to whether it may be able to show by a preponderance of the evidence that Mr. Moeller was not harmed or prejudiced by its

failure.  Accordingly, the Crockett Counterclaimants' motion for summary judgment on this issue (Dkt. No. 187) is DENIED.[3]  Specialty Surplus's motion for summary judgment on this issue (Dkt. No. 220) is also DENIED.

The parties also cross-move for summary judgment as to whether Specialty Surplus waived the scope of employment defense.[4]  Washington law regarding waivers

> requires that the insurers voluntarily and intentionally relinquished a known right or that
> their conduct warrants an inference of the relinquishment of such right.  *Voluntarily* implies
> a choice, a conscious decision to relinquish a right; conduct giving rise to a waiver
> argument cannot be consistent with any other interpretation than intent to waive.

*Saunders v. Lloyd's of London*, 779 P.2d 249, 254 (Wash. 1989) (internal citations omitted).  Here, Specialty Surplus vigorously disputes that its *Crockett* ROR letter can be read as containing a voluntary relinquishment of the right to assert the scope of employment coverage defense.  The Crockett Counterclaimants contend that the following actions constituted a waiver: (1) not asserting the defense in the *Crockett* ROR letter even though it had been asserted in the *Rhodes* ROR letter; (2) "admitting" that Mr. Moeller was an "insured" in the *Rhodes* declaratory judgment action; (3) "admitting" that Mr. Moeller was an "insured" in the *Crockett* declaratory judgment action; (4) failing to inform Mr. Moeller of his counsel of the intent to assert the scope of employment coverage defense for about one year; (5) failing to

---

[3] The Crockett Counterclaimants moved to strike Specialty Surplus's factual assertions about an "investigation" it conducted into the availability of its scope of employment coverage defense.  The argument in support of the motion demonstrates an overly narrow interpretation of what "investigation" should mean.  This motion is DENIED. However, the Crockett Counterclaimants may rest assured that the Court will not deem sufficient "investigation" to have occurred without proper and sufficient evidence of such "investigation."

The Crockett  Counterclaimants also moved to strike Specialty Surplus's assertion that at the time the *Crockett* ROR letter was issued, nobody could have known whether the facts of the case would support a scope-of-employment defense.  Again, this motion is DENIED.  Specialty Surplus is permitted to make this argument, but without evidentiary support, it will not be accepted by the Court as true.

The Crockett Counterclaimants' third motion to strike is DENIED for the same reasons.

[4] The Crockett Counterclaimants do not assert the theory that equitable estoppel would bar Specialty Surplus's ability to rely on the scope of employment coverage defense.  (Crockett Counterclaimants' Opp'n to Pl.'s Mot. re: Purported Firing, etc. 17.)

ORDER - 18

1   conduct an investigation as to the scope of employment coverage defense; and (6) not drafting and/or

2   sending a *Crockett* ROR letter containing a specific assertion of the scope of employment coverage

3   defense.

4       The Crockett Counterclaimants' assertions that Specialty Surplus "admitted" that Mr. Moeller was

5   an "insured" are meritless.  Specialty Surplus later amended its complaints in both the *Rhodes* and *Crockett*

6   declaratory actions to assert that Mr. Moeller might not be an "insured."  Accordingly, the Court does not

7   find that Specialty Surplus "admitted" anything with respect to Mr. Moeller's status.

8       The Crockett Counterclaimants' assertions with respect to Specialty Surplus's failure to inform Mr.

9   Moeller of its assertion of, or intent to assert, the scope of employment coverage defense are also without

10  merit as to the waiver argument.  While Specialty Surplus's failure may operate to prevent it from being

11  able to assert the defense under another theory, this failure does not amount to the kind of voluntary and

12  intentional relinquishment necessary to bar assertion of the defense under a waiver theory.

13      The fact that the defense was mentioned in the *Rhodes* letter does not change this analysis.  Even if

14  the Crockett Counterclaimants could prove that Specialty Surplus "removed" (as opposed to the more

15  passive "omitted") the specific assertion of the scope of employment coverage defense from the *Crockett*

16  ROR letter, the intentionality of the "removal" does not equate to an intention *not to assert* the defense.  It

17  is this latter that must be shown in the context of a waiver argument.  Accordingly, the Court finds that

18  neither the "omission" nor the possible "removal" of the defense from the *Crockett* ROR letter constitutes a

19  voluntary and intentional relinquishment.

20      The Crockett Counterclaimants frequently mention Specialty Surplus's "failure" to conduct an

21  "investigation" with respect to the policy's coverage of Mr. Moeller.  While it is true that there is no

22  evidence on the record that an "investigation" took place, this does not mean that Specialty Surplus did not

23  fulfill its obligation under the law.  The Crockett Counterclaimants imply that an insurer's obligation to

24

ORDER - 19

1    "investigate" requires it to send out a network of personnel to collect information.  However, the evidence

2    is that Specialty Surplus opened a coverage file and that they retained coverage counsel.  It also shows that

3    they were actively assessing their coverage as the facts developed.  The Crockett Counterclaimants do not

4    muster any authority supporting their implied argument that an insurer's "investigation" must involve

5    more.

6         Indeed, the cases in which an insurer is found to have failed to "investigate" usually involve total

7    incuriosity on the insurer's part, a willful blindness to the facts, or an unexplained failure to eliminate

8    known plausible alternative explanations for the events giving rise to the claim.  *See, e.g.*, *Indus. Indem.*

9    *Co. of the Nw., Inc. v. Kallevig*, 792 P.2d 520, 527–28 (Wash. 1990) (referring to *Safeco Ins. Co. of Am. v.*

10   *JMG Restaurants, Inc.*, 680 P.2d 409 (Wash. Ct. App. 1984) and *Phil Schroeder, Inc. v. Royal Globe Ins.*

11   *Co.*, 659 P.2d 509 (Wash. 1983)).  *See also Bryant v. Country Life Ins. Co.*, 414 F. Supp. 2d 981, 1000

12   (W.D. Wash. 2006).  An insurer "may not deny coverage based on a supposed defense which a reasonable

13   investigation would have proved to be without merit." *Kallevig*, 792 P.2d at 526.  The parameters of a

14   "reasonable" investigation, therefore, are dependent on the factual circumstances of each case.  In the

15   present case, the Crockett Counterclaimants offer no support for their conclusory allegation that Specialty

16   Surplus failed to investigate its coverage defenses in an adequate manner.  Accordingly, the Court declines

17   to find as a matter of law that Specialty Surplus failed to investigate.  In turn, Specialty Surplus's alleged

18   "failure" to investigate cannot support a finding of waiver.

19        Even if it is ultimately shown that Specialty Surplus failed to investigate its scope of employment

20   coverage defense, this "failure," like its omissions of a specific mention of the defense from the *Crockett*

21   ROR letter, does not amount to the kind of voluntary and intentional relinquishment necessary to bar

22   assertion of the defense under a waiver theory.

23

24

ORDER - 20

In sum, the Court finds that the waiver theory does not bar Specialty Surplus from asserting the scope of employment coverage defense. Specialty Surplus's motion for summary judgment as to this issue is GRANTED. The Crockett Counterclaimants' cross-motion as to this issue is DENIED.

### 2.    *Firing of Mr. Moeller's Counsel*

In the first few days of April, after Mr. Moeller entered into his settlement agreements with the Crockett Counterclaimants, Ms. Phelan attempted to fire Mr. Moeller's counsel retroactive to March 20, 2005. The Court has already had occasion to address this issue in its January 30, 2006 order. At that time, the Court found that there were genuine issues of material fact about why Specialty Surplus might have thought that it was appropriate to fire Mr. Moeller's counsel and have new counsel attend the reasonableness hearing. The Court also noted its discomfort with the specific circumstances of the attempted firing, which appeared to be a "decision to fire defense counsel and substitute new counsel to attend a reasonableness hearing on a settlement agreement crafted by former defense counsel against the wishes of the insurer."

The more fully developed facts and the relevant chronology about this event are as follows: On March 20, 2005, Mr. Moeller's counsel reached a final agreement with the *Crockett* Plaintiffs as to a settlement. On March 21, 2005, Mr. Moeller's counsel appeared in Court to have the judgment entered. Mr. Moeller's counsel did not speak to Ms. Phelan or anybody else representing Specialty Surplus until March 23, 2005. Ms. Phelan's notes about this conversation are as follows:

> 3/23/05    . . . seems that this is the first they could get a hold of us since te judgement was entered into on Sunday night and confirmed Monday morning —
>
> We know they are picking a jury today for the 2 def still in the case . . . — so we will pay there bill up to Sunday when they had discussed same —

(Phelan Claim File Notes SSIC-M-027.) On April 1, Ms. Hammond forwarded to Ms. Phelan a copy of the *Crockett* Plaintiffs' motion for a determination of reasonableness of the Moeller settlement. This e-mail

1    prompted Ms. Phelan's April 4 tersely worded response: "As per our prior discussion, as of Sunday March

2    20, 2005 we no longer need your services.  We will have another attorney go to this conference."  (SSIC-

3    M-087.)  Ms. Hammond responded the same day, explaining that during the "prior discussion" referred to

4    by Ms. Phelan, counsel for Mr. Moeller had said that "there was very little left to do" rather than nothing

5    left to do.  (SSIC-M-085.)  She also explained that they would need to be Mr. Moeller's counsel of record

6    for at least thirteen more days, meaning that they would have to attend the reasonableness hearing, unless

7    Specialty Surplus preferred to substitute them with other counsel.

8         It appears that Ms. Hammond may also have contacted Mr. Rallo, Ms. Phelan's supervisor, at

9    around the same time she responded to Ms. Phelan's e-mail, in order to explain the situation.  (*See* Rallo

10   Dep. 33:20–36–17.)  The result of this contact with Mr. Rallo was that Ms. Hammond and Mr. Clement

11   would continue to represent Mr. Moeller.  On April 6, Ms. Phelan confirmed to Ms. Hammond via e-mail

12   that she would still be the attorney of record until April 17, "and thereafter you will no longer be

13   representing Mr. Moeller or Specialty Surplus Insurance Company."  (SSIC-M-085.)

14        Ultimately, Ms. Hammond and Mr. Clement represented Mr. Moeller through June 20, 2005,

15   because the reasonableness hearing was continued.  The record also reflects that Specialty Surplus paid the

16   bills through this date.

17        Under these factual circumstances, the Court cannot find that Specialty Surplus acted in bad faith.

18   First, although it appears that Ms. Phelan attempted to relieve Mr. Moeller's counsel, Mr. Moeller was at

19   no time actually left unrepresented.  (*See* Hammond Dep. 168:8–13.)  Once Ms. Hammond spoke to Mr.

20   Rallo and explained her continuing obligations to Mr. Moeller, Mr. Rallo consented to her continuing

21   representation of Mr. Moeller.  (Rallo Dep. 35:9–10.)  Second, it appears that Ms. Phelan's attempt to fire

22   Mr. Moeller's counsel was primarily motivated by two things: (1) Ms. Phelan was under the

23   misapprehension that there was "nothing" left to do on the file after the settlement was reached; and (2) Ms.

24

Phelan and Ms. Hammond appear to have had an extraordinarily poor working relationship (*see* Rallo Dep. 36:6–17).  Neither of these reasons, separate or even together, constitute bad faith (*e.g.*, engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk) on Specialty Surplus's part.

In addition, the Crockett Counterclaimants have failed to show that any harm resulted from Ms. Phelan's attempt to fire counsel for Mr. Moeller.  More importantly at the summary judgment stage, they have failed to show that there is any genuine issue of material fact that Mr. Moeller might have suffered harm or prejudice from this action.  Accordingly, the Court GRANTS Specialty Surplus's motion as to the "retroactive firing" issue.

> ### 3.   *Separation of Mr. Moeller's File from Second Chance's File*

Specialty Surplus originally assigned a single claims adjuster, Mr. Jason Messler, to handle both the Second Chance and the Moeller claims files.  The Crockett Counterclaimants argue that Specialty Surplus's failure to assign separate adjusters to the files from their inception caused Mr. Moeller actual harm because this failure caused the insurer to be unable to assess the claims against Mr. Moeller.

When this issue was previously before the Court in January, the Court found that the Crockett Counterclaimants had failed to connect the alleged commingling of the files with either any insurer-insured conflict of interest or a greater concern for Specialty Surplus's own monetary interests than for Mr. Moeller's.  (Jan. 30, 2006 Order 22–23.)  Although the Crockett Counterclaimants advance new theories on why Specialty Surplus's handling of the file constituted bad faith and caused actual harm, the Court finds that only one of these theories is sufficiently substantiated by the evidence to raise a genuine issue of material fact.

First, the Crockett Counterclaimants have failed to substantiate the argument that Specialty Surplus had a duty to split the files earlier than it did.  "In order to establish bad faith, an insured is required to show

1   the breach was unreasonable, frivolous, or unfounded." *Kirk v. Mt. Airy Ins. Co.*, 951 P.2d at 1126.  Here,

2   the Crockett Counterclaimants appear to skip over the necessary showing of a breach directly to the harm

3   element.  To the extent that they attempt to establish a breach, they are unsuccessful.  Mr. Magalee's note

4   to Ms. Phelan stating, among other things, that "Jason should not be involved in any part of Moeller's

5   defense because of the potential for the conflict of interest" (Crockett Counterclaimants' Opp'n to Pl.'s

6   Mot. re: Bad Faith for Conflict of Interest 12) is immaterial.  Mr. Magalee does not specify whether the

7   "conflict of interest" he references is between the insurer and the insured or between Second Chance and

8   Mr. Moeller.  If he was referring to the conflict between Second Chance and Mr. Moeller, as is more likely

9   given the full text of the note, as this Court already explained in its January 30 order, it is unclear, without

10  further explanation, how a conflict of interest *between* the *defendant-insureds* has any bearing on the

11  existence of a conflict of interest between the *insurer* and the *insured*.  The Crockett Counterclaimants have

12  failed to supply any such further explanation.

13       Second, the evidence firmly establishes that once the files had been split, Ms. Hammond repeatedly

14  promised to report to Ms. Phelan on the status of the case, and on at least two occasions, to supply Ms.

15  Phelan with a comprehensive account of Mr. Moeller's case.  (*See, e.g.*, SSIC-M-192 (Feb. 28, 2005 E-mail

16  from E. Hammond to C. Phelan) (promising "look for my summary/comprehensive letter in your inbox

17  tomorrow morning"); Hammond Dep. 89:7–9 (acknowledging that "[d]uring the conversation, the initial

18  conversation, when [Ms. Phelan] was looking through her file trying to figure out what the file was about,

19  she said, 'Oh, I need a pretrial report from you, so I'll send you the form.'"); Hammond Dep. 107:1–108:10

20  (acknowledging follow-up with Ms. Phelan about the pre-trial report and that it was never completed and

21  sent back to Ms. Phelan); SSIC-M-173 (Mar. 8, 2005 Ltr. from E. Hammond to C. Phelan (stating "I expect

22  to be able to have [the pretrial report] to you on Monday, March 14th)).)  The evidence also establishes that

23  no such written report was ever sent.  Furthermore, Ms. Hammond testified at her deposition that she had

24

1  not seen the reports sent to Specialty Surplus by Second Chance's counsel prior to the file split.

2  (Hammond Dep. 50:14–23.)

3      All of these factors together lead the Court to conclude that Specialty Surplus's lack of full

4  information about Mr. Moeller's case cannot fairly be fully attributed to a failing on Specialty Surplus's

5  part.  Ms. Phelan repeatedly requested a pre-trial report from Ms. Hammond, and Ms. Hammond had no

6  idea what Ms. Phelan might already know from the reporting done by Second Chance prior to the file split,

7  yet Ms. Hammond failed to provide a written pre-trial report (whether on Specialty Surplus's form or in a

8  different format) specific to Mr. Moeller's case at any time when it might have had an effect on Ms.

9  Phelan's assessment of the settlement value of the case.

10     Third, there is no evidence that Specialty Surplus's failure to split the file *earlier* harmed or

11  prejudiced Mr. Moeller's defense in any way.  Although the files were not split earlier, there is no evidence

12  that Mr. Moeller's defense counsel was controlled in any way relating to Second Chance.

13     However, the Crockett Counterclaimants argue that even after the files were officially split,

14  Specialty Surplus failed to treat the files completely separately.  As evidence of this, they offer Ms.

15  Phelan's claim file notes reflecting that she discussed the case with Mr. Messler even after the files were

16  split.  Although the notes indicate that there was some cross-file communication, very few of the notes

17  contain communications that are somehow impermissible.  Some of the notes reflect that Ms. Phelan was

18  instructed to "hold off on the MLR to go with Jasons file" and that "Jerry stated that Jasons file already did

19  an MLR so one not needed ont [*sic*] this one."  (Crockett Counterclaimants' Opp'n to Pl.'s Mot. re: Bad

20  Faith for Conflict of Interest 10.)  There is nothing to suggest that these instructions were anything more

21  than an immaterial matter of internal procedure.  In a similar vein, the note stating, "I think the limit Jason

22  advised is only 1 million for both files not seperately [*sic*] — as this is a pro liability" does not set off any

23  conflict warning bells.

24

ORDER - 25

However, a few of Ms. Phelan's notes hint at what could have been improper file coordination:

Had a discussion with Jerry and Jason on this file and Jerry stated no more monies offered my file we will wait to see at trial as per the ROR if Mr Moeller is found guilty. . . .

Also wait to speak to Jason and there atty re coverage and then get back to Erin. . . .

I asked Jason what transpired in [*sic*] anything.

(Crockett Counterclaimants' Opp'n to Pl.'s Mot. re: Bad Faith for Conflict of Interest 10.)  On the other hand, there are also notes indicating that the separation between the files was occasionally functional.  (*See*, *e.g.*, *id*. (citing notes stating "Jasons atty will not speak to my [*sic*] as per Jerrys request" and "I have been kept out of the loop with regards to meetings with Jeff Jerry and Jason re coverage and if there will be a substitute for Erin").)

The common theme running through these more troubling claim notes is Specialty Surplus's handling of the scope of employment coverage issue.  The Crockett Counterclaimants argue, and the notes could support a factual finding, that Specialty Surplus improperly used the information garnered from both files to come to the conclusion that it was in Specialty Surplus's best interests to allow the underlying matter proceed to trial, because of its coverage defenses.  The notes could be interpreted as evidence that Specialty Surplus was not willing to make more efforts to settle Mr. Moeller's case because it was becoming clearer that it would be able to assert an effective coverage defense and disclaim coverage after the underlying trial.

Accordingly, the Court finds that the evidence in the record raises a genuine issue of material fact that Specialty Surplus may have improperly leveraged its knowledge of the two files and coordinated its settlement efforts in the two files in order to have Mr. Moeller's case proceed to trial only to disclaim coverage at the end.  However, the Court does not find that the *timing* of the file splitting itself was, as a matter of law, unreasonable, unfounded, or frivolous.

ORDER - 26

1  Specialty Surplus's motion is GRANTED in part and DENIED in part with respect to its handling

2  of the file split.

3          *4.*      *Notification re: Insurance Coverage Amount*

4       The Crockett Counterclaimants argue that Specialty Surplus's failure to inform Mr. Moeller or his

5  counsel that the available insurance coverage for the *Crockett* litigation was limited to $965,000 affected

6  Mr. Moeller's settlement posture, thereby causing harm to his defense.[5]  The Crockett Counterclaimants

7  base this claim on the holding in *Anderson v. State Farm Mutual Insurance Co.*, in which the court found

8  that an insurer's failure to disclose the full extent of coverage constitutes bad faith as a matter of law.  2

9  P.3d 1029, 1034 (Wash. Ct. App. 2000).  Although the *Anderson* Court faulted the insurer for not having

10  disclosed the full extent of coverage in that case, the facts of the case at bar are so different from the facts

11  in *Anderson* as to make *Anderson* hardly relevant here.

12       The *Anderson* Court found that the insurer committed bad faith when it failed to inform its insured

13  of the possible availability of underinsured motorist coverage because there was no basis at that early stage

14  for the insurer to have determined that the coverage was not available.  The *Anderson* insurer in effect

15  *concealed* coverage from its insured.  Here, the allegations are exactly the opposite — the Crockett

16  Counterclaimants complain that Specialty Surplus failed to inform Mr. Moeller that his coverage was

17  purportedly limited to $965,000 (the per-occurrence limit minus the amount paid in the *Rhodes* litigation).

18  In effect, the Crockett Counterclaimants argue that Specialty Surplus did not inform Mr. Moeller of its

19  intentions regarding the per-occurrence limit, and that it did not inform him that the *Rhodes* settlement

20  might be deducted from the available insurance amount.  Because *Anderson* was about an insurer's failure

21  to notify an insured about *more* possible coverage, the Court does not find that *Anderson* is applicable to

22  the facts of the present case.

23  

24  [5] The Crockett Counterclaimants abandon their bad faith claim regarding Specialty Surplus's typographical error stating that the insurance policy limits were $2 million.

1    In addition, the Court does not find that Specialty Surplus "failed" in any way with respect to

2    notifying Mr. Moeller of the evidently lower-than-contemplated amount.  If indeed, Specialty Surplus did

3    not inform him expressly about the limits, it is unclear how this alleged failure was unreasonable,

4    unfounded, or frivolous.  The Crockett Counterclaimants baldly assert that the alleged failure constitutes

5    bad faith without explaining wherein lies the breach of duty to the insured.

6    Finally, the Crockett Counterclaimants' argument as to harm is similarly deficient.  Although they

7    assert that Mr. Moeller relied on the availability of $3 million in evaluating his risks, they do not explain

8    how he did so, and why a smaller available amount would have changed his litigation strategy.

9    These conclusory assertions are insufficient to oppose Specialty Surplus's motion for summary

10   judgment that it did not commit bad faith with respect to notifying Mr. Moeller as to the amount of

11   available coverage.  Accordingly, the Court GRANTS Specialty Surplus's motion as to this issue.

12                    5.    *Emotional Distress*

13   Specialty Surplus moves to dismiss the Crockett Counterclaimants' claims for negligent infliction

14   of emotional distress and intentional infliction of emotional distress.  The Crockett Counterclaimants'

15   response stated that they have not asserted these claims.  (Crockett Counterclaimants' Opp'n to Pl.'s Mot.

16   re: Bad Faith for Emotional Distress 17.)  Accordingly, Specialty Surplus's motion as to these two claims is

17   GRANTED.

18   The Crockett Counterclaimants *do*, however, seek to recover for Mr. Moeller's emotional distress

19   allegedly resulting from Specialty Surplus's culpable conduct.  (*Id.*)  Although the Crockett

20   Counterclaimants argue that Specialty Surplus has "admitted" that Mr. Moeller suffered such emotional

21   distress (presumably referring to Specialty Surplus's citation from Mr. Moeller's deposition (Pl.'s Mot. re:

22   Bad Faith for Emotional Distress 22)), the Crockett Counterclaimants do not cite to any actual such

23   admission.  At the most, the evidence in the record shows that Mr. Moeller suffered some emotional

24

ORDER - 28

1  distress.  It does not establish a link between the alleged emotional distress and Specialty Surplus's

2  culpable conduct.  At most, the Court might infer that Mr. Moeller's distress was caused by the stresses of

3  litigation.  This is insufficient to sustain a claim for compensatory emotional distress damages.

4      As the Crockett Counterclaimants have failed to show that there is a genuine issue of material fact

5  remaining to be resolved, Specialty Surplus's motion for summary judgment as to this issue is

6  GRANTED.[6]  The Crockett Counterclaimants' cross-motion is DENIED.

7          6.    *Deprivation of Opportunity to Settle*

8      The Crockett Counterclaimants move for summary judgment on their claim that Specialty Surplus

9  committed bad faith in depriving Mr. Moeller of the opportunity to settle the claims against him.  The

10  Court previously denied the Crockett Counterclaimants' motion as to this same issue, finding that there

11  were still genuine issues of material facts regarding whether (1) Specialty Surplus's decision not to

12  communicate the *Crockett* Plaintiffs' November 30, 2004 policy limits settlement offer letter to Mr.

13  Moeller was in bad faith and (2) Specialty Surplus could elicit information from Mr. Moeller's deposition

14  showing that he did not suffer prejudice or harm as a result of not having been timely informed of the

15  November 30 settlement opportunity.  (Jan. 30, 2006 Order 10–16.)

16      The Court's January 30 order expressed skepticism as to Specialty Surplus's then-stated reasons for

17  not having conveyed the settlement opportunity to Mr. Moeller or his counsel.  The Court first explained

18  that *Tank* does not stand for the proposition that *only* settlement offers made by the *insurer* must be

19  disclosed to the insured.  (Jan. 30, 2006 Order 12.)  The Court then referred to *Tank*'s requirement that the

20  insurer "refrain from engaging in any action which would demonstrate a greater concern for the insurer's

21  monetary interest than for the insured's financial risk."  (*Id.* (citing 715 P.2d at 1137).)  Finally, the Court

22

23  ——————————————

24  [6] Specialty Surplus's Motion for Summary Judgment re: Alleged *Tank* Violation (Dkt. No. 228) is GRANTED as to this issue.

1    noted that Specialty Surplus had conceded that Mr. Moeller, as the insured in a reservation-of-rights

2    defense, had the ultimate power to decide whether to settle.  (*Id.*)

3         Since the Court's January 30, 2006 Order, more facts have been added to the record, most notably

4    the deposition of Mr. Messler, the addressee of the November 30, 2004 settlement letter.  Mr. Messler

5    testified that this letter was the first time he had received any correspondence directly from the *Crockett*

6    Plaintiffs.  (Messler Dep. 78:20–22.)  He also testified that he thought news of the letter would get to Mr.

7    Moeller through Mr. Murphy (Second Chance's counsel), since "everything that went to Murphy would get

8    through to Clement, and through Clement to Moeller, obviously" (*id.* 79:9–12), and that he sent it to Mr.

9    Murphy even though he thought it was directed only to Specialty Surplus because "I just felt it was safer

10   for me to just send it to counsel, because he had been dealing with [the *Crockett* Plaintiffs]" (*id.* 79:16–20).

11        Mr. Messler's deposition testimony adds some much-needed depth to the evidence already before

12   the Court.  This evidence consisted primarily of the November 30 letter itself and of Specialty Surplus's

13   failure to notify Mr. Moeller of the letter.  As the Court noted in its January 30 order, there were some

14   unresolved problems with the November 30 letter that could have a determinative impact on the Crockett

15   Counterclaimants' legal claim.  The Court was particularly troubled by the fact that the letter was

16   specifically addressed to Mr. Messler and contained no indication that copies had been sent to counsel for

17   the insureds (which they had not been), yet had language stating "the plaintiffs are offering Second Chance

18   and John Moeller an opportunity to settle for policy limits."

19        Mr. Messler offers a credible explanation of why he did not convey the settlement offer to Mr.

20   Moeller, even though he conveyed the settlement offer to Second Chance.  He also offers a credible

21   explanation of why he might have believed that it was not necessary to convey the offer to the insureds at

22   all.  More importantly, if these reasons are true, they would tend to negate the appearance of bad faith.

23   Because of the particular history of this case, the Court is not willing to find as a matter of law, on the sole

24

ORDER - 30

1   basis of the testimony cited above, that Specialty Surplus did *not* violate its *Tank* duty in failing to

2   communicate the settlement offer to Mr. Moeller or his counsel.  Specialty Surplus's motion for summary

3   judgment on this issue (Dkt. No. 228) is DENIED.  However, the Court finds that Specialty Surplus has

4   raised a genuine issue of material fact remaining to be resolved as to whether its failure to convey the

5   settlement letter was unreasonable.  Accordingly, the Court DENIES the Crockett Counterclaimants'

6   motion as to whether the deprivation of the opportunity to settle was in bad faith.[7]  (Dkt. No. 225.)  In so

7   doing, however, the Court reiterates the following from its January 30, 2006 order:

8           [T]here would seem to be few factual scenarios in which an insurer's withholding of
        information from an insured could be shown not to be relatively self-serving vis à vis the
9       insured's interests.  Thus, even if an insurer's obligation to keep its insured informed does
        not absolutely mandate disclosure of a settlement offer made by an opposing party, the
10      Court concludes that *Tank*'s prohibition on actions favoring an insurer's interests over an
        insured's, in most cases, results in disfavor of an insurer's failure to communicate
11      settlement offers to an insured.

12  (Jan. 30, 2006 Order 12.)

13          If the Crockett Counterclaimants are able to show that Specialty Surplus's failure to convey the

14  settlement offer to Mr. Moeller was unreasonable, it is Specialty Surplus's burden to rebut the presumption

15  of harm.  In its January 30, 2006 order, the Court deferred decision on this element "in light of the

16  possibility that Specialty Surplus may elicit testimony tending to show that Mr. Moeller suffered no

17  ─────────────────────
    [7] Specialty Surplus offered several more reasons why it was not unreasonable for it to have failed to convey the
18  settlement demand letter to Mr. Moeller: (1) because the letter asked for $3 million, and only $1 million (the per-
    occurrence limit) was available, the letter was not a true "policy limits" demand; (2) it would have been unable to
19  provide the sworn representation that no other coverage was available to the insureds; and (3) the offer could not be
    independently accepted by the insureds or the insurer.  The first argument is not well taken.  Indeed, Specialty
20  Surplus itself is well aware of *Truck Insurance Exchange of Farmers Insurance Group v. Century Indemnity Co.*,
    887 P.2d 455, 460 (Wash. Ct. App. 1995), on which it has previously erroneously relied for the proposition that the
21  insurer is obliged *only* to communicate to an insured every settlement offer that exceeds policy limits.  This case
    imposes a positive obligation on an insurer to communicate every settlement offer that exceeds policy limits.  *Id.*
22  The second argument is not sufficient justification for failing to convey the settlement offer.  If the settlement offer
    turns out to have been one that should have been conveyed, the insureds and/or Specialty Surplus could easily have
    discussed with the *Crockett* Plaintiffs the problems with the sworn representation requirement.  Finally, the last
23  problem had not yet become a problem relieving Specialty Surplus of its obligation to convey settlement offers.  As
    insureds must be the ones to make the settlement decision, if the settlement offer was one that should have been
24  conveyed, Mr. Moeller was entitled to the opportunity at least to negotiate with Second Chance as to its settlement
    decision.  Accordingly, the Court finds that these three reasons (not previously offered) are without merit.

1   prejudice." (Jan. 30, 2006 Order 15.) Specialty Surplus now argues that "Moeller's 'lost opportunity to

2   settle' boils down to the opportunity to ask Specialty Surplus to settle by acceding to the demand." (Pl.'s

3   Resp. to Mot. re: Settlement Opportunity 11.) This is a meaningless argument. Moeller, as the insured,

4   was the party "who must make the ultimate choice regarding settlement." *Tank*, 715 P.2d at 1138. If this

5   choice involved asking the insurer to pay the settlement amount, it was his prerogative to do so. The fact

6   that Mr. Moeller would have had to ask Specialty Surplus to pay the settlement does not relieve Specialty

7   Surplus of its *Tank* obligation to convey the settlement offer (if such an obligation is found). Any

8   difficulties between Mr. Moeller and the insurer at that point would play out.

9        Specialty Surplus also argues that even after Mr. Moeller became aware of the settlement offer, he

10  made no attempt to settle the case, either through contacting the *Crockett* Plaintiffs or through asking

11  Specialty Surplus more about the November 30 offer. However, Specialty Surplus cannot rely on Mr.

12  Moeller's behavior after receiving the letter after its response deadline as indicative of what he might have

13  done if he had received it prior to the response deadline. He may well have acted differently had the offer

14  still been open.

15        For the foregoing reasons, the Court rejects Specialty Surplus's proffered "evidence" that no harm

16  or prejudice resulted from its failure to convey the November 30 settlement offer. Accordingly, the

17  presumption of harm still operates in the Crockett Counterclaimants' favor. Specialty Surplus's motion for

18  summary judgment finding that no harm resulted (Dkt. No. 228) is DENIED.

19                    *7.    "Admitted" Unethical Behavior*

20        The Crockett Counterclaimants move for summary judgment that Specialty Surplus acted in bad

21  faith as a matter of law when it chose to wait for the underlying *Crockett* litigation to go to trial before

22  making a determination as to its coverage for Mr. Moeller. The Crockett Counterclaimants rely in large

23  part on several pieces of deposition testimony obtained from Mr. Rallo, Mr. Messler, and Ms. Phelan.

24

ORDER - 32

1        With respect to Mr. Rallo's deposition testimony, Specialty Surplus is correct that the critical

2  statements upon which the Crockett Counterclaimants rely were responses to hypothetical questions.  For

3  example, when asked if he would have offered more than $500 per *Crockett* plaintiff if he had been advised

4  by Mr. Moeller's defense counsel that the claims were worth more, Mr. Rallo readily conceded that he

5  would have increased the offer.  However, the premise of the question was a hypothetical situation in which

6  Mr. Moeller's counsel had spoken to Specialty Surplus about the value of the case.  The parties dispute

7  whether Mr. Moeller's counsel ever did so in a meaningful way.  Therefore, Mr. Rallo's response does not

8  have any evidentiary value.  In a similar vein, Mr. Rallo testified in general terms that he did not consider it

9  ethical for an insurer to "[g]et a verdict and then decide if we are going to cover the person."  (Rallo Dep.

10  30:1–19.)  However, Mr. Rallo's general opinions as to insurer ethics have no bearing on whether in this

11  particular case, Specialty Surplus breached its duty of good faith with respect to Mr. Moeller.

12        The Crockett Counterclaimants also rely on the statement in Ms. Hammond's letter to Specialty

13  Surplus, dated March 19, 2005, in which she "documented" that "Specialty Surplus intended to wait for a

14  determination at trial whether Mr. Moeller was within the course and scope of employment or not."

15  (Crockett Counterclaimants' Reply re: Admitted Unethical Conduct 2.)  However, Ms. Hammond's letter,

16  composed after she and Mr. Clement had been actively engaged in settlement negotiations with the

17  *Crockett* Plaintiffs, and after she had been asked by the *Crockett* Plaintiffs whether the insurer had been

18  "set up" for a bad faith claim, does not constitute reliable evidence of what Specialty Surplus intended to

19  do.

20        Specialty Surplus correctly identifies the issue in the present case as whether it was unfounded,

21  unreasonable or frivolous for it to decide not to pay for settlement of the claims against Mr. Moeller, and

22  instead, let the underlying case against him be tried.  However, this is only part of its burden.  As an insurer

23  defending an action under a reservation of rights, Specialty Surplus was also required to "refrain from

24

ORDER - 33

1    engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than

2    for the insured's financial risk."[8]  *Tank*, 715 P.2d at 1137.  Therefore, as an insurer providing a reservation

3    of rights defense, even if it had had excellent coverage defenses (*i.e.*, it would not be unfounded,

4    unreasonable or frivolous to disclaim coverage), if Specialty Surplus acted in a way demonstrating a greater

5    concern for its own monetary interest than for the insured's financial risk, the Court could find that it had

6    breached its duty of good faith to Mr. Moeller.

7         Specialty Surplus admits in its response (Dkt. No. 189) to the Crockett Counterclaimants' Motion

8    re: Admitted Unethical Conduct that it planned to permit the underlying *Crockett* action against Mr.

9    Moeller to go to trial.  (Pl.'s Opp'n to Mot. Summ. J. re: Claimed Unethical Conduct 10–12.)  It justifies

10   this decision by explaining that it had a reasonable belief that it had solid coverage defenses.  If Specialty

11   Surplus were correct that its only obligation to Mr. Moeller was to avoid acting in an unreasonable,

12   unfounded, or frivolous manner, its allegedly reasonable coverage defenses would be sufficient to insulate

13   its decision to wait for trial from a bad faith claim.  However, as the Court explained *supra*, Specialty

14   Surplus was also obliged not to put its own monetary interest ahead of Mr. Moeller's.  Thus, even once it

15   had determined that it had solid coverage defenses, it was obliged to act in a way that valued Mr. Moeller's

16   financial interest at least as highly as its own interest.

17        The record as to whether Mr. Moeller's financial risks were treated fairly is equivocal.  Ms.

18   Phelan's file notes strongly suggest that as time went on, Specialty Surplus's intent to rely on the

19   determination at trial of the scope of employment issue in order to disclaim coverage crystallized.  As it did

20   so, the insurer became less interested in conducting itself in a way consistent with treating its own interest

21

22   _____

     [8] To the extent that Specialty Surplus argues that its only duty was to avoid acting in an unreasonable, unfounded, or
     frivolous manner, it is incorrect.  (Pl.'s Mot. Summ. J. re: *Tank* Violation 6.)  The cases it cites to for support do not

23   involve reservations of rights situations.  *See*, *e.g.*, *Ellwein v. Hartford Acc. & Indem. Co.*, 15 P.3d 640 (Wash.
     2001) (not mentioning that the defense was an ROR defense); *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 330–31

24   (Wash. 2002) (Chambers, J., dissenting, noting that the insurer could have chosen to defend under an ROR but had
     not done so); *Keller v. Allstate Ins. Co.*, 915 P.2d 1140 (Wash. 1996) (not involving an ROR defense).

ORDER - 34

1  and Mr. Moeller's interests with equal regard.  Ms. Phelan testified in her deposition that she couldn't

2  recall whether she had taken Mr. Moeller's personal financial interests into consideration.  (Phelan Dep.

3  50:19–52:24.)

4      On the other hand, Specialty Surplus contends that it had good reason to believe, as Ms. Phelan

5  wrote to Ms. Hammond in her fax dated March 14, 2005, that Mr. Moeller "has no liability."  Specialty

6  Surplus claims that it offered such a low amount to settle the case because it never received any contrary

7  information from Mr. Moeller's counsel that the case was worth more.  It further argues that much of the

8  information it *did* have up to that point, including deposition summary information tending to discredit

9  several of the *Crockett* Plaintiffs, supported the conclusion that the financial risks posed by the case were

10 not very high.

11     While Mr. Rallo *did* testify that he thought Mr. Moeller was liable, he also testified that he thought

12 the claims were probably not worth very much.  The fact that Ms. Hammond's March 8, 2005 letter stated

13 that "there is real risk to Mr. Moeller's personal assets" and that it recommended that Specialty Surplus pay

14 the policy limits, if necessary, to settle the case, does not necessarily render Specialty Surplus's position as

15 to Mr. Moeller's liability unreasonable.  A few days prior to the March 8 letter, on March 4, Ms. Hammond

16 had characterized thirty-one of the plaintiffs as relying on "fabricated testimony," and in recounting the

17 events at the mediation, did not offer an opinion as to the reasonableness either the settlement amount

18 authorized by Specialty Surplus or the *Crockett* Plaintiffs' demanded amount.

19     Thus, it does appear that Specialty Surplus's course of action in declining to negotiate further could

20 have been taken in good faith, based on its knowledge and understanding of the *Crockett* Plaintiffs' case as

21 filtered through Ms. Hammond.  Certainly, the Court cannot find, as a matter of law, that in light of what

22 Specialty Surplus knew (and what it did not know), that it clearly held its own interests in higher regard

23

24

ORDER - 35

1    than Mr. Moeller's.  However, it is not clear whether these reasons, now so clearly articulated in opposition

2    to the Crockett Counterclaimants' motion, were the motivating reasons at the time the decisions were made.

3        The record's equivocality clearly leaves open the possibility that based on its knowledge of what

4    was happening in the Second Chance file (as Mr. Rallo was still actively involved in both files, and as he

5    was giving Ms. Phelan direction on what to do with her file) Specialty Surplus knew that if it were to

6    proceed to trial, Second Chance would likely be found not liable on the grounds that Mr. Moeller was

7    acting outside the scope of his employment.  Use of this knowledge in this way, rather than informing Mr.

8    Moeller of the risks, would demonstrate a greater concern for the insurer's interests than for Mr. Moeller's.

9        Because the Court finds that genuine issues of material fact remain as to why Specialty Surplus

10   discontinued its settlement negotiations with the *Crockett* Plaintiffs, the Crockett Counterclaimants' motion

11   re: admitted unethical conduct (Dkt. No. 179) must be DENIED.

12       *8.    Crockett Counterclaimants' Supplemental Interrogatory Responses*

13       Specialty Surplus moves for summary judgment with respect to additional allegations of bad faith

14   actions asserted by the Crockett Counterclaimants in their supplemental interrogatory responses.  (Dkt. No.

15   240.)  The Crockett Counterclaimants consented to withdraw all of the claims on issues other than those

16   addressed in sections 1, 2, and 7 of Specialty Surplus's moving brief.  These issues are fully briefed in the

17   parties' other summary judgment motions.  Accordingly, Specialty Surplus's motion is GRANTED except

18   with respect to the exempted issues, which are treated separately *supra*.

19       *C.    Did Specialty Surplus Have a Duty to Settle?*

20       As with many of the other issues already addressed, the Court has already had occasion to address

21   this question in the context of a summary judgment motion.  In its January 30, 2006 order, the Court

22   declined to find as a matter of law that Specialty Surplus had breached its duty to settle the claims against

23

24

Mr. Moeller.  Although the Court did not reach an ultimate conclusion of law, the Court determined the applicable standard of behavior to which Specialty Surplus would be held as follows:

> in order to satisfy *Tank*, whatever course of action Specialty Surplus had mapped out or planned to map out, that course of action must have considered the risk to Mr. Moeller's interests as they were explained to Specialty Surplus by Mr. Moeller's counsel, and must not have demonstrated greater concern for Specialty Surplus's own monetary interest than for Mr. Moeller's.

(Jan. 30, 2006 Order 19.)  In making this determination, the Court explained that Specialty Surplus was permitted to consider *whether* it owes a settlement payment when it considers the *amount* of such a payment.  (*Id.* 18.)  Thus, in this context, the strength of Specialty Surplus's coverage defenses is relevant and could be considered.[9]

Although this is a slightly different legal issue than the issue discussed above in the section analyzing Specialty Surplus's decision to allow the underlying *Crockett* litigation to proceed to trial, its analysis shares many of the same factual predicates.  Accordingly, for the same genuine issues of material fact identified *supra* in Section (B)(7), the Court cannot make a finding as a matter of law at this time.[10]

In addition to the previously mentioned material facts, the parties disagree as to the import of deposition testimony from Mr. Rallo, Mr. Messler, and Ms. Phelan.  Although the Crockett Counterclaimants offer this testimony in support of the factual assertion that none of Specialty Surplus's "strong" coverage defenses were actually considered by the claims adjusters in determining a reasonable settlement amount — positing, rather, that the adjusters considered only the non-disclosed scope-of-

---

[9] To the extent that Specialty Surplus's motion argues that the caselaw imposes upon it no duty to settle whatsoever where coverage is disputed, the Court's previous order contains the operative statement of law for this case.  The Court adheres to its analysis as presented in the January 30, 2006 order.  The Court also observes that Specialty Surplus attempts to resuscitate its hybrid duty-to-pay/duty-to-settle argument.  The Court already disposed of this argument in its January 30, 2006 order, quite clearly stating that the duty to pay and the duty to settle are two distinct duties with distinct roots.  (Jan. 30, 2006 Order n.4.)

[10] The Court will note, however, that the import of Ms. Hammond's opinion that Mr. Moeller was in imminent jeopardy (Jan. 30, 2006 Order 19) has been altered by facts that have come to light since the Court last had occasion to consider this case.  The Court refers to the timing of Ms. Hammond's "warning" to Ms. Phelan relative to Ms. Hammond's involvement in settlement negotiations with counsel for the *Crockett* Plaintiffs.

ORDER - 37

1   employment coverage defense — Specialty Surplus is correct in pointing out that the questions eliciting

2   these responses may have limited the responses.  Accordingly, the Court declines to interpret the proffered

3   deposition testimony as conclusive evidence that the adjusters considered only the scope-of-employment

4   coverage defense in determining a reasonable settlement amount.  The Crockett Counterclaimants' motion

5   to strike Specialty Surplus's motion for summary judgment as to its duty to settle is DENIED.

6       It must be noted that even if Specialty Surplus did not breach a duty to settle in refusing to offer

7   more money, or in withdrawing its settlement offer, it may still be found to have acted in bad faith if its

8   failure to adequately explain these actions to Mr. Moeller was due to a failure to hold Mr. Moeller's

9   financial interests equal to its own.

10          D.      *Did Specialty Surplus's Policy Provide Coverage for Mr. Moeller?*

11      Specialty Surplus moves for a summary judgment order finding that its policy provides no coverage

12   for the *Crockett* claims against Mr. Moeller.  (Dkt. No. 218.)

13      "Insurance policies are to be construed as contracts, and interpretation is a matter of law."  *State*

14   *Farm Gen. Ins. Co. v. Emerson*, 687 P.2d 1139, 1141–42 (Wash. 1984).  In construing the language of an

15   insurance policy, a court must construe the entire contract together so as to give force and effect to each

16   clause.  *Am. Star Ins. Co. v. Grice,* 854 P.2d 622, 625 (Wash. 1993).  If the language of an insurance

17   contract is clear and unambiguous, the court must enforce it as written and may not modify it or create

18   ambiguity where none exists.  *Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co.*, 881 P.2d 1020,

19   1025 (Wash. 1994).

20      "The court examines the terms of an insurance contract to determine whether under the plain

21   meaning of the contract there is coverage."  *Kitsap County v. Allstate Ins. Co.*, 964 P.2d 1173, 1178

22   (Wash. 1998).

23          Whether coverage exists is a two-step process.  First, the insured must prove that the policy
            covers his loss.  Thereafter, to avoid coverage the insurer must prove that specific policy

24

ORDER - 38

language excludes the insured's loss.  Ultimately, we determine coverage by characterizing the perils contributing to the loss, and determining which perils the policy covers and which it excludes.

*Truck Ins. Exch. V. BRE Props., Inc.*, 81 P.3d 929, 932 (Wash. Ct. App. 2003) (citations omitted).

Here, Specialty Surplus's policy provided coverage under two rubrics: "Coverage A" and "Coverage B."  The Crockett Counterclaimants seek coverage only under Coverage B.  (Crockett Counterclaimants' Opp'n to Pl.'s Mot. Summ. J. re: Coverage 12.)

Coverage B provides:

a.    We will pay those sums that the insured becomes legally obligation to pay as damages because of "personal injury". . . .

b.    This insurance applies to:

(1)    "Personal injury" caused by an offense arising out of your criminal justice system operations, excluding advertising, publishing, broadcasting or telecasting done by or for you. . . .

but only if the offense was committed in the "coverage territory" during the policy period.[11]

(RCL DEC-0046.)

"Personal injury" is defined as

injury, other than 'bodily injury,' arising out of one or more of the following offenses: . . . .

e.    Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

f.    Oral or written publication of material that violates a person's right of privacy;

g.    Defamation of character; or

h.    Violation of civil rights, including discrimination.

---

[11] The Crockett Counterclaimants do not claim coverage under the provisions relating to "advertising injury." (Crockett Counterclaimants' Opp'n to Pl.'s Mot. re: Coverage 21.)

1   (RCL DEC-0056.)  "Occurrence" is defined as "an accident, including continuous or repeated exposure to

2   substantially the same general harmful conditions."  (RCL DEC-0055.)  "Insured" is defined as "Your

3   employees . . . but only for acts within the scope or their employment by you or while performing duties

4   related to the conduct of your criminal justice system operations."  (RCL DEC-0050.)  Finally, the policy

5   provided that "[t]his insurance does not apply to: 'personal injury' . . . which was, or should have been,

6   known to the insured during the Claims-Made Policy Period."  (RCL DEC-0010.)

7           Specialty Surplus argues that Mr. Moeller knew or should have known of the injuries to clients

8   before January 12, 2001.  In Washington, "if an event causing loss is not contingent or unknown prior to

9   the effective date of the policy, there is no coverage."  *Overton*, 38 P.3d 322, 326 (Wash. 2002) (quoting

10  *City of Okanogan v. Cities Ins. Ass'n*, 865 P.2d 576 (Wash. Ct. App. 1994)).  The Crockett

11  Counterclaimants contend that they did not know that they were injured until they learned that they had

12  been videotaped.  It follows, they argue, that Mr. Moeller could not possibly have known, or have been

13  expected to know of injuries that had not yet occurred.  This argument has no merit.

14          The relevant "event" causing loss is not the *Crockett* Plaintiffs' discovery that they had been

15  videotaped, but the videotaping itself.  *Overton* is directly on point.  In that case, where the insured had

16  notice of the defective condition triggering the loss before the policy inception period, the court found it

17  immaterial that the insured did not have notice of the third-party injuries resulting from that defective

18  condition until after the policy incepted.  38 P.3d at 326 (distinguishing *Gruol Constr. Co. v. Ins. Co. of N.*

19  *Am.*, 524 P.2d 427 (Wash. Ct. App. 1974)).  Here, Mr. Moeller's videotaping activities occurred in or about

20  the end of 1999 and into the beginning of 2000.  Mr. Moeller acknowledges that his scheme to monitor

21  Second Chance clients through his closed-circuit camera was deliberate, rather than accidental or

22

23

24

ORDER - 40

1   unconscious.  This alone would be enough to support a finding under *Overton* that Mr. Moeller had the

2   requisite knowledge to negate coverage.[12]

3          However, the facts of the case go even farther — Mr. Moeller "knew" within the meaning of the

4   policy prior to the policy coverage period that his activities caused the precise type of injury alleged by the

5   *Crockett* Plaintiffs because of the Bagby action.

6          Under these facts, even though the Crockett Counterclaimants attempt to show that Mr. Moeller did

7   not actually "know," the Court finds as a matter of law that Mr. Moeller should have known of the losses

8   prior to inception of the Specialty Surplus policy because he knew of his actions in videotaping the Second

9   Chance clients.  Accordingly, the Court finds that Specialty Surplus has no duty to pay under the terms of

10  its insurance policy.

11         Because the Court finds that the known-loss doctrine applies to preclude coverage in this case, the

12  Court does not address Specialty Surplus's remaining theories regarding coverage.

13         Specialty Surplus's motion for summary judgment finding that it has no duty to pay as to the

14  *Crockett* claims against Mr. Moeller is GRANTED.[13]

15         E.      *Collusion & Fraud*

16         Specialty Surplus moves for a summary judgment order finding that the Crockett Counterclaimants'

17  settlement was collusive and fraudulent, and therefore unenforceable against Specialty Surplus.  (Dkt. No.

18  219.)  The Crockett Counterclaimants filed a "cross-motion" arguing that Specialty Surplus's motion was

19  conclusive evidence of bad faith.  (Dkt. No. 233.)  This cross-motion is DENIED.

20

21  _____

[12] It follows, therefore, that the relevant injury here does not fall into the category referenced by the Court in its
22  holding that "coverage would be provided for an injury resulting from an occurrence of which Defendant had
    knowledge but which was not known, nor should it have been known, to be likely to result in injury".  (Dec. 11,
23  2003 Order 4.)
    [13] The Court does not, at this juncture, make any finding as to whether Specialty Surplus may *assert* this coverage
24  defense.  The Court's finding here is limited to the narrow issue of whether Specialty Surplus has any potentially
    valid coverage defenses.

1    Specialty Surplus acknowledges that before this Court may address its collusion and fraud

2    argument, the Court must determine whether the state court's finding that the settlement was reasonable has

3    a preclusive effect.  Although Specialty Surplus urges that this Court address this issue now, it has also

4    filed with this Court a notice of its motion in the King County Superior Court for relief from that court's

5    finding that the settlement was reasonable.  (Dkt. No. 281.)  The factual basis for its state court motion is

6    the same as the factual basis for the motion now before this Court.

7    The Court will briefly address this factual basis — the second declaration of Lori Nelson Adams

8    (Dkt. No. 279).  According to Specialty Surplus, this declaration contains information not produced to it

9    until June 21, 2006.  Specialty Surplus's motion regarding collusion and fraud was filed on May 22, 2006.

10   Its reply was filed June 16, 2006, five days before the documents at issue here were received.  The Court

11   finds that the failure to file the second Adams declaration in a timely manner was not due to any fault on

12   Specialty Surplus's part.  In addition, the Court observes that the Crockett Counterclaimants have not

13   argued or shown that admission of the documents attached to the declaration would be unfair or prejudicial.

14   Accordingly, the Crockett Counterclaimants' motion to exclude the declaration (Dkt. No. 280) is DENIED.

15   "Considerations of 'wise judicial administration, giving regard to conservation of judicial resources

16   and comprehensive disposition of litigation,' may counsel abstention from an issue when there are

17   concurrent state proceedings involving the same matter as in the federal district court."  *Intel Corp. v.*

18   *Advanced Micro Devices, Inc.*, 1 F.3d 908, 912 (9th Cir. 1993) (citing *Colo. River Conservation Dist. v.*

19   *United States*, 424 U.S. 800, 817 (1976)).  *Colorado River* abstention is only appropriate in exceptional

20   circumstances.  *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 19 (1983).  The

21   determination of whether exceptional circumstances exist involves a pragmatic and flexible balancing of

22   factors.  *Id.*  Generally, the factors considered are as follows: (1) which court first assumed jurisdiction over

23   the property in dispute; (2) the inconvenience of the federal forum; (3) the desirability of avoiding

24

1    piecemeal litigation; and (4) the order in which jurisdiction was obtained. *Colo. River*, 424 U.S. at 818.

2    Additional relevant factors may also be considered. *See, e.g.*, *Moses H. Cone*, 460 U.S. at 16 (assessing the

3    relative progress of the state and federal actions); *id.* at 19 (considering the possible inadequacy of the state

4    court proceedings); *40235 Wash. St. Corp. v. Lusardi*, 976 F.2d 587, 588 (9th Cir. 1992) (also considering

5    whether state or federal law controls decision on the merits).

6          In the present case, the Court finds that factors 3 and 4, as well as the factors considering the

7    relative progress of the state and federal actions and the adequacy of the state court proceedings, weigh

8    heavily in support of the Court's abstention from deciding Specialty Surplus's motion as to collusion and

9    fraud pending resolution of the state court proceedings. Here, Specialty Surplus's motion in the state court

10   presents the state court with an opportunity to reassess the reasonableness of the *Crockett* settlement. If

11   that court were to alter its ruling as to the reasonableness of the settlement, many of Specialty Surplus's

12   arguments in its motion before this Court regarding issue preclusion would be moot and there would be no

13   need for a finding that collateral estoppel would work an injustice. Furthermore, as the court originally

14   tasked with determining whether the Crockett settlement was reasonable, the state court is in the best

15   position to determine on the basis of the newly discovered evidence whether it still reaches that conclusion.

16         The remaining factors have little relevance or impact in the instant analysis. For these reasons, the

17   Court finds that Specialty Surplus's motion regarding collusion and fraud is characterized by exceptional

18   circumstances justifying the exercise of *Colorado River* abstention. Therefore, the Court declines to

19   address this motion at this time. The motion will be stricken from the Court's calendar. Specialty Surplus

20   may renew its motion by simple notice to the Court once the state court has addressed its motion for relief.

21   If any party wishes to further brief the issue in light of the state court decision, the parties are to reach

22   agreement on a new briefing schedule. Additional briefing shall be limited to 5 pages for each brief.

23

24

ORDER - 43

1

*F.    Punitive Damages*

2

Specialty Surplus moves for summary judgment dismissing the Crockett Counterclaimants' claim

3

for punitive damages under New York law.  (Dkt. No. 217.)  The Crockett Counterclaimants acknowledge

4

that

5

> [p]unitive or exemplary damages have been allowed in cases where the wrong complained
> of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish
> the defendant but to deter him, as well as others who might otherwise be so prompted, from
> indulging in similar conduct in the future.

6

7

*Walker v. Sheldon*, 10 N.Y.2d 401, 404 (N.Y. 1961).

8

Whatever the Crockett Counterclaimants may be able to show with respect to the alleged

9

widespread nature of Specialty Surplus's claims-handling behavior, the Court's does not find that the facts

10

of this case as they have been developed so far (exhaustively reviewed in the course of addressing the

11

parties' motions) raise a real possibility that the Crockett Counterclaimants will be able to show that

12

Specialty Surplus engaged in morally culpable behavior, or that it had "evil and reprehensible" motives.

13

Even if the Crockett Counterclaimants ultimately succeed on their remaining bad faith claims, bad

14

faith does not amount to "wanton dishonesty" equal to "a criminal indifference to civil obligations."  *Id.* at

15

405.  The Crockett Counterclaimants fail to show that a reasonable finder of fact could find in their favor

16

on this issue, even drawing all reasonable inferences in their favor.

17

Accordingly, the Court GRANTS Specialty Surplus's motion as to punitive damages.  (Dkt. No.

18

217.)

19

IV.    CONCLUSION

20

In accordance with the foregoing:

21

(1)    Crockett Counterclaimants' Motion re: Admitted Unethical Conduct (Dkt. No. 179) is
         DENIED;

22

23

(2)    Crockett Counterclaimants' Motion re: Scope of Employment (Dkt. No. 187) is GRANTED
         in part and DENIED in part;

24

(3)    Plaintiff Specialty Surplus's Motion re: Punitive Damages (Dkt. No. 217) is GRANTED;

(4)    Plaintiff's Motion re: Coverage for Claims Against John Moeller (Dkt. No. 218) is GRANTED (with limitations as noted);

(5)    Plaintiff's Motion re: Collusion and Fraud (Dkt. No. 219) is STRICKEN;

(6)    Plaintiff's Motion re: Bad Faith for (1) Purported Firing of Moeller's Counsel, (2) Conflict of Interest, (3) Aggregate Limit, (4) Scope of Employment and (5) Emotional Distress (Dkt. No. 220) is GRANTED in part and DENIED in part;

(7)    Plaintiff's Motion re: Duty to Settle (Dkt. No. 221) is DENIED;

(8)    Crockett Counterclaimants' Motion re: Deprivation of Settlement Opportunity (Dkt. No. 225) is DENIED;

(9)    Crockett Counterclaimants' Motion re: Duty to Settle (Dkt. No. 227) is DENIED;

(10)    Plaintiff's Motion re: Alleged *Tank* Violation (Dkt. No. 228) is GRANTED in part and DENIED in part;

(11)    Crockett Counterclaimants' Cross-Motion re: Firing, Conflict, Limits and NIED (Dkt. No. 231) is GRANTED in part and DENIED in part;

(12)    Crockett Counterclaimants' Cross-Motion re: Collusion and Fraud (Dkt. No. 233) is DENIED; and

(13)    Plaintiff's Motion re: Issues Raised in Supplemental Interrogatory Response (Dkt. No. 240) is GRANTED.

SO ORDERED this 23rd day of August, 2006.

_____

UNITED STATES DISTRICT JUDGE

ORDER - 45